ROBINSON, J.
**296 In this appeal, we consider the relationship between General Statutes § 45a-655 (b) and (d)[1] in determining whether a *349 spousal support order **297 previously rendered by the Probate Court is binding on the defendant, the Commissioner of Social Services (commissioner), when calculating the allowance that may be diverted to the support of the community spouse of a Medicaid eligible institutionalized person pursuant to 42 U.S.C. § 1396r-5, a provision originally enacted as part of the Medicare Catastrophic Coverage Act of 1988 (catastrophic coverage act), Pub. L. No. 100-360, § 303 (a) (1) (B), 102 Stat. 683, 754. The commissioner appeals[2] from the judgment of the trial court sustaining the administrative appeal brought by the plaintiffs, Paul Valliere (Paul) and Ellen Shea, the conservatrix and executrix of the estate of Paul's late wife, Marjorie Valliere (Marjorie), from the commissioner's decision to set a community spouse allowance for Paul in the amount of $0 with respect to the Medicaid benefit that paid for Marjorie's long-term residential care. On appeal, the commissioner contends that, because § 45a-655 (b) and (d) must be construed in light of the federal single state agency requirement that is implemented by General Statutes § 17b-261b,[3] the trial court improperly **298 *350 concluded that the community spouse allowance was controlled by a spousal support order rendered by the Probate Court prior to the application for, and award of, Medicaid benefits. We disagree and, accordingly, affirm the judgment of the trial court.
The record reveals the following undisputed facts and relevant procedural history. On November 18, 2012, Marjorie was admitted to MidState Medical Center (MidState). On November 24, 2012, MidState discharged Marjorie to the Meriden Center, a skilled nursing facility, where she resided until her death on October 17, 2013. Paul continued to reside in their family home in Meriden. On March 18, 2013, the Probate Court appointed Shea, Marjorie's daughter, as conservatrix of Marjorie's estate.[4]
On March 21, 2013, Shea filed an application in the Probate Court seeking an order of spousal support for Paul pursuant to § 45a-655, contending that, in order to continue to reside in the community and pay the cost of his own "support, maintenance and medical treatment,"[5] Paul needed to "own, use and exercise control over all or some of the [nonincome] producing assets, the income producing assets, [Marjorie's] total net income and [his own] total net income, all retroactive to March 18, 2013," the date that the Probate Court appointed Shea as conservatrix. The application further represented that Marjorie was "not receiving public assistance, state administered general assistance, or **299 Medicaid, and [she] has not applied for or is receiving such medical assistance, but [she] reserves, and does not waive, her right to prepare, file and prosecute in the future [an] application, claiming [Medicaid] benefits." (Emphasis in original.) Shea provided notice of the application to the commissioner and to the Department of Administrative Services.
Following a hearing, on June 25, 2013, the Probate Court issued a decree, pursuant to §§ 45a-655 (a) and (b), and 17b-261b, which made findings in accordance with the representations in the application, namely, that, "[i]n order to continue to reside in the community and pay the cost of [his own] support, maintenance and medical treatment," Paul "now requires, and in the future will continue to require, to own, to use, and to exercise control over all or some of the [nonincome] producing assets, of the income producing assets, of [Marjorie's] total net income and [his own] total net income." In addition to directing Shea to transfer Marjorie's assets to Paul, the Probate Court ordered Shea, inter alia, to pay Marjorie's total net monthly income of $1,170.33 to Paul as spousal support, "which amount ... is known, identified, and defined as ... the community spouse allowance in [ 42 U.S.C. § 1396r-5 (d) (5) ][6]
*351 and in [Dept. of Social Services, Uniform Policy Manual § 5035.30 (B) (1) (b) ]."[7] (Footnote added.) The **300 Probate Court directed that this payment be made retroactive to November 18, 2012, the date Marjorie was admitted to MidState. The Probate Court provided notice of the hearing and a copy of the decree to the commissioner.
On July 15, 2013, an application was filed with the Department of Social Services (department) seeking Medicaid assistance for Marjorie. The department granted that application but, in doing so, declined to follow the community spouse allowance set in the Probate Court's decree. Instead, the department determined that Marjorie had an applied income obligation that required her to pay $898.45 monthly toward her care from April, 2013, through her death in October, **301 2013, and that no community spouse allowance was available pursuant to department policy.[8]
On February 13, 2014, Shea requested an administrative fair hearing for the purpose of challenging the department's refusal to accept the community spouse allowance set by the Probate Court. After a hearing, the commissioner, acting through a hearing officer, issued a decision on October 10, 2014, upholding the denial of the requested community spouse allowance and the determination of Marjorie's applied income obligation. The hearing officer concluded that, under § 17b-261b, the department is the "sole agency" tasked with determining eligibility for Medicaid benefits under state and federal law, and the Probate Court lacked the authority to set the community spouse allowance for *352 Medicaid purposes. Specifically, the hearing officer concluded that, once an individual applies for Medicaid under § 45a-655 (d), only the department may set the community spouse allowance. Rejecting the plaintiffs' reliance on 42 U.S.C. § 1396r-5 (d) (5), the federal Medicaid statute addressing preexisting court orders, the hearing officer criticized the plaintiffs for what he described as "obvious" forum shopping, observing that it was "clear from a review of the Probate Court decree and the sequence of events that ... the Probate Court [was being used] to make a Medicaid eligibility determination, which the law does not permit." The hearing officer subsequently denied a timely request for reconsideration.
On December 8, 2014, the plaintiffs filed an administrative appeal pursuant to General Statutes § 4-183 challenging the commissioner's decision. In its comprehensive memorandum of decision, the trial court **302 observed that this case concerned the interplay between the federal and state statutes implementing the catastrophic coverage act. Emphasizing that no party had challenged the Probate Court's determination with respect whether the support ordered was " 'proper under the circumstances of the case,' " the trial court concluded that, consistent with 42 U.S.C. § 1396r-5 (d) (5), § 45a-655 (b) authorized the Probate Court to set the community spouse allowance at the time that it did because Marjorie had not yet applied for or received Medicaid benefits. The trial court further determined that the restriction in § 45a-655 (d) applies only when "an institutionalized conserved person 'has applied for or is receiving [Medicaid benefits].' " The trial court determined that these subsections of § 45a-655"thus harmonized the standards the Probate Court must utilize in the approval of a [community spouse allowance] with the Medicaid scheme. If no prior court order has entered then the department is free, indeed required, to apply the standard enunciated by [ 42 U.S.C. § 1396r-5(d)(2) through (4) ].[9] Where a prior court order regarding **304 *353 a [community spouse allowance] has entered, however, the department is obliged to adopt that amount pursuant to [ 42 U.S.C.] § 1396r-5 (d) (5)."[10] (Footnote added.) Accordingly, the trial court rendered judgment sustaining the plaintiffs' administrative appeal from the department's community spouse allowance calculation "that would have resulted in [no] community spouse allowance and $898.45 in applied income rather than [the] prior Probate Court ... calculation [that] would have resulted in a [community spouse allowance] of $1170.33 and no applied income." This appeal followed.
On appeal, the commissioner argues that 42 U.S.C. § 1396r-5 (d) (2) and (3) sets a uniform national standard for the calculation of community spouse allowances, subject to an exception in 42 U.S.C. § 1396r-5 (d) (5) for court-ordered support, *354 and for "exceptional circumstances resulting in significant financial duress" under 42 U.S.C. § 1396r-5 (e) (2), which provides a fair hearing procedure for spouses dissatisfied with their allowances.[11] The commissioner then contends that **305 § 17b-261b implements the federal "single state agency" requirement of 42 U.S.C. § 1396a (a) (5), which renders the department the "sole agency to determine eligibility" for Medicaid and, therefore, restricts the Probate Court's authority to approve community spousal support to an "order [that] is consistent with state and federal law." The commissioner further contends that the Probate Court exceeded its authority under § 46b-655 (b) because only the department may determine the Medicaid community spouse allowance. As such, the commissioner then argues that the Probate Court exceeded its limited authority under § 45a-655 (d) by **306 ordering community spouse support in an amount that exceeded that which the department could order pursuant to 42 U.S.C. § 1396r-5 (2) through (4). To this end, the commissioner cites Gomprecht v. Gomprecht , 86 N.Y.2d 47, 652 N.E.2d 936, 629 N.Y.S.2d 190 (1995), and M.E.F. v. A.B.F. , 393 N.J. Super. 543, 925 A.2d 12 (App. Div.), cert. denied, 192 N.J. 479, 932 A.2d 29 (2007), for the proposition that the retroactive nature of the Medicaid determination, which precedes the date of the probate decree, limited the court's discretion under § 46b-655 (d) to render an award that exceeded the federal limitations.
In response, the plaintiffs, supported by the amicus curiae, the Office of the Probate Court Administrator,[12] emphasize *355 the complementary roles of the Probate Court and the department within the Medicaid scheme as envisioned by § 17b-261b (b), which requires the Probate Court and the applicant to provide notice of the spousal support application and order to the department, which then has the right to appear at the hearing on the application. Consistent with the federal single state agency requirement, the plaintiffs contend that § 17b-261b (b) allows the commissioner to take a position on a proposed spousal support order before it is rendered by the court pursuant to § 45a-655 (b), insofar as the federal and state statutes and § 5035.30 (B) (1) (b) of the Uniform Policy Manual require it to follow preexisting court orders. Also relying on M.E.F. v. A.B.F. , supra, 393 N.J. Super. at 543, 925 A.2d 12, the plaintiffs argue that the trial court's interpretation of the federal and state statutes is consistent with the plain language of § 45a-655 (b) and, particularly, the tense of the verbs **307 used therein; they contend that the federal single state agency requirement under §§ 17b-261b and 45a-655 (d) was not triggered because the Probate Court application and decree preceded the application for Medicaid. Citing Dept. of Social Services v. Saunders , 247 Conn. 686, 715, 724 A.2d 1093 (1999), the plaintiffs further argue that the department's argument improperly seeks to diminish the Probate Court's statutory authority. We agree with the plaintiffs and conclude that, under the plain and unambiguous language of §§ 45a-655 and 17b-261b, and 42 U.S.C. § 1396r-5 (d) (5), the department was bound by the Probate Court's preexisting spousal support order when it determined that there would be no community spouse allowance under department policy.
In considering whether the Probate Court's order was binding upon the department's determination of the community spouse allowance, we first observe that the "Probate Court is a court of limited jurisdiction prescribed by statute, and it may exercise only such powers as are necessary to the performance of its duties.... As a court of limited jurisdiction, it may act only when the facts and circumstances exist upon which the legislature has conditioned its exercise of power.... Such a court is without jurisdiction to act unless it does so under the precise circumstances and in the manner particularly prescribed by the enabling legislation." (Citations omitted; internal quotation marks omitted.) Heussner v. Hayes , 289 Conn. 795, 802-803, 961 A.2d 365 (2008) ; see also In re Bachand , 306 Conn. 37, 59-61, 49 A.3d 166 (2012) (Probate Court's limited jurisdiction creates constraints over its authority, even with respect to matter over which Superior Court has concurrent jurisdiction). Thus, whether the Probate Court had jurisdiction to render the decree challenged by the commissioner presents a question of statutory interpretation. See In re Bachand , supra, at 42, 49 A.3d 166.
**308 Given the procedural posture of this case, we review "the trial court's judgment pursuant to the Uniform Administrative Procedure Act (UAPA), General Statutes § 4-166 et seq. Under the UAPA, it is [not] the function ... of this court to retry the case or to substitute its judgment for that of the administrative agency.... Even for conclusions of law, [t]he court's ultimate duty is only to decide whether, in light of the evidence, the [agency] has acted unreasonably, arbitrarily, illegally, or in abuse of its discretion.... [Thus]
*356 [c]onclusions of law reached by the administrative agency must stand if the court determines that they resulted from a correct application of the law to the facts found and could reasonably and logically follow from such facts.... [Similarly], this court affords deference to the construction of a statute applied by the administrative agency empowered by law to carry out the statute's purposes.... Cases that present pure questions of law, however, invoke a broader standard of review than is ... involved in deciding whether, in light of the evidence, the agency has acted unreasonably, arbitrarily, illegally or in abuse of its discretion.... Furthermore, when a state agency's determination of a question of law has not previously been subject to judicial scrutiny ... the agency is not entitled to special deference.... We have determined, therefore, that the traditional deference accorded to an agency's interpretation of a statutory term is unwarranted when the construction of a statute ... has not previously been subjected to judicial scrutiny [or to] ... a governmental agency's time-tested interpretation .... Even if time-tested, we will defer to an agency's interpretation of a statute only if it is reasonable; that reasonableness is determined by [application of] our established rules of statutory construction....
"When construing a statute, [o]ur fundamental objective is to ascertain and give effect to the apparent intent **309 of the legislature.... In seeking to determine that meaning, General Statutes § 1-2z directs us first to consider the text of the statute itself and its relationship to other statutes. If, after examining such text and considering such relationship, the meaning of such text is plain and unambiguous and does not yield absurd or unworkable results, extratextual evidence of the meaning of the statute shall not be considered.... The test to determine ambiguity is whether the statute, when read in context, is susceptible to more than one reasonable interpretation.... When a statute is not plain and unambiguous, we also look for interpretive guidance to the legislative history and circumstances surrounding its enactment, to the legislative policy it was designed to implement, and to its relationship to existing legislation and common law principles governing the same general subject matter .... The question of statutory interpretation presented in this case is a question of law subject to plenary review." (Citations omitted; internal quotation marks omitted.) Commissioner of Public Safety v. Freedom of Information Commission , 312 Conn. 513, 525-27, 93 A.3d 1142 (2014).
For purposes of the UAPA, no special deference is required because there is no claim that the department's construction of the applicable statutes is time-tested, or has previously been subject to judicial scrutiny. Thus, "[i]n order properly to characterize the issues on appeal, it is necessary to overview the complex of statutes and regulations governing [M]edicaid eligibility for institutionalized applicants. The [M]edicaid program, established in 1965 as Title XIX of the Social Security Act, and codified at 42 U.S.C. § 1396 et seq., is a joint federal-state venture providing financial assistance to persons whose income and resources are inadequate to meet the costs of necessary medical care.... States participate voluntarily in the [M]edicaid program, but participating states must develop a plan, approved by the **310 [S]ecretary of [H]ealth and [H]uman [S]ervices, containing reasonable standards ... for determining eligibility for and the extent of medical assistance .... Connecticut has elected to participate in the [M]edicaid program and has assigned to the department the task of administering the program.... The department, as part of its uniform policy manual, has promulgated *357 regulations governing the administration of Connecticut's [M]edicaid system. See General Statutes § 17b-260.
"In 1988, Congress passed into law the ... catastrophic [coverage] act .... [The provision subsequently codified as 42 U.S.C. § 1396r-5 ] was intended ... to ease the financial burden placed on a community spouse[13] under the prior statutory regime that required the institutionalized spouse to spend down a large portion of the couple's resources, and thus impoverish the community spouse, before becoming eligible for [M]edicaid. See, e.g., Krueger Estate v. Richland County Social Services , 526 N.W.2d 456, 458 (N.D. 1994).... Under the catastrophic [coverage] act, a community spouse is entitled to receive a community spouse resource allowance (resource allowance), which is approximately one half of the couple's total liquid resources or $60,000, adjusted annually for inflation, whichever is less. 42 U.S.C. § 1396r-5 (f) (2).... The resource allowance is protected from the institutionalized applicant's health care obligations and does not count against the applicant's financial eligibility.
"In addition, under the catastrophic [coverage] act, a community spouse is entitled to a minimum monthly maintenance needs allowance (minimum needs allowance).
**311 [14] 42 U.S.C. § 1396r-5 (d) (3).... If the community spouse's income from outside sources is insufficient to meet his minimum needs allowance, the institutionalized spouse is permitted to bridge this deficit by transferring income to the community spouse. 42 U.S.C. § 1396r-5 (d) (1) (B) and (2). If the transferred income is insufficient to reach the minimum needs allowance, the community spouse may then apply for an increase in his resource allowance to an amount adequate to fund his minimum needs allowance. 42 U.S.C. § 1396r-5 (e) (2) (C) ; see also Krueger Estate v. Richland County Social Services , supra, 526 N.W.2d at459. Because this increase in the resource allowance results from a transfer of resources from the institutionalized spouse to the community spouse,[15] the value of the institutionalized spouse's resources is brought closer to the eligibility level.[16]
**312 *358 "Under 42 U.S.C. § 1396r-5 [ (e) (2) ][17] a community spouse may obtain an increase in his [resource allowance or] his minimum needs allowance [as determined by the department] by establishing, at a fair hearing, a need for additional income due to exceptional circumstances resulting in significant financial duress ...." (Citations omitted; footnotes added and omitted; internal quotation marks omitted.) Burinskas v. Dept. of Social Services , 240 Conn. 141, 148-50, 691 A.2d 586 (1997) ; see Fagan v. Bremby , 244 F.Supp.3d 280, 281-82 (D. Conn. 2017) ; see also Palomba-Bourke v. Commissioner of Social Services , 312 Conn. 196, 203-206, 92 A.3d 932 (2014).
As is required by § 1-2z, we begin with the text of the statutes at issue, starting with § 45a-655 (b) and (d), which governs spousal support orders. Section 45a-655 (b) provides that the "conservator of the estate of a married person may apply such portion of the property of the conserved person to the support, maintenance and medical treatment of the conserved person's spouse which the Court of Probate, upon hearing after notice, decides to be proper under the circumstances of the case." Section 45a-655 (d), however, limits the authority of the conservator and the Probate Court with respect to "an institutionalized person who has applied for or is receiving ... medical assistance," by providing that, "[n]otwithstanding the provisions of subsections (a) and (b) of this section, in the case of an institutionalized person who has applied for or is receiving such medical assistance, no conservator shall apply and no court **313 shall approve the application of (1) the net income of the conserved person to the support of the conserved person's spouse in an amount that exceeds the monthly income allowed a community spouse as determined by the [department] pursuant to [ 42 U.S.C. 1396r-5 (d) (2) through (4) ], or (2) any portion of the property of the conserved person to the support, maintenance and medical treatment of the conserved person's spouse in an amount that exceeds the amount determined allowable by the department pursuant to [ 42 U.S.C. § 1396r-5 (f) (1) and (2) ], notwithstanding the provisions of [ 42 U.S.C. § 1396r-5 (f) (2) (A) (iv) ], unless such limitations on income would result in significant financial duress." (Emphasis added.)
When these subsections are read in juxtaposition, it is apparent that the legislature's use of the word "notwithstanding" in subsection (d) indicates its desire to carve out an exception to the authority of the Probate Court and conservator when a person has sought or is receiving medical assistance, insofar as it limits the court's authority to award support to the amount approved by the department pursuant to 42 U.S.C § 1396r-5 (d) (2) through (4). See Gay & Lesbian Law Students Assn. v. Board of Trustees , 236 Conn. 453, 473, 673 A.2d 484 (1996). "[If] there are two provisions in a statute, *359 one of which is general and designed to apply to cases generally, and the other is particular and relates to only one case or subject within the scope of a general provision, then the particular provision must prevail; and if both cannot apply, the particular provision will be treated as an exception to the general provision." (Internal quotation marks omitted.) Gifford v. Freedom of Information Commission , 227 Conn. 641, 652-53, 631 A.2d 252 (1993). "[W]e have long held that provisos and exceptions to statutes are to be strictly construed with doubts resolved in favor of the general rule rather than the exception and that those who claim **314 the benefit of an exception under a statute have the burden of proving that they come within the limited class for whose benefit it was established." (Internal quotation marks omitted.) Gay & Lesbian Law Students Assn. v. Board of Trustees , supra, at 473-74, 673 A.2d 484 ; see also Gifford v. Freedom of Information Commission , supra, at 655 n.15, 631 A.2d 252 (describing use of language following word "notwithstanding" to broaden or narrow scope of exception).
Moreover, the legislature's use of the present perfect and present progressive verb tenses in § 45a-655 (d) is significant. Specifically, the legislature has restricted the Probate Court's authority only in those situations in which the institutionalized spouse "has applied for or is receiving" medical assistance. General Statutes § 45a-655 (d) ; see also Schieffelin & Co. v. Dept. of Liquor Control , 194 Conn. 165, 175, 479 A.2d 1191 (1984) ("[t]he use of the present perfect tense of a verb indicates an action or condition that was begun in the past and is still going on or was just completed in the present"); Pollansky v. Pollansky , 144 Conn. App. 188, 193, 71 A.3d 1267 (noting that present perfect tense as used in notice to quit statute, General Statutes § 47a-23 [a] [3], contemplates "termination [of tenancy] that occurs simultaneously with the delivery of a notice to quit"), cert. denied, 310 Conn. 919, 76 A.3d 633 (2013). Moreover, "[w]here a statute, with reference to one subject contains a given provision, the omission of such provision from a similar statute concerning a related subject ... is significant to show that a different intention existed." (Internal quotation marks omitted.) State v. B.B. , 300 Conn. 748, 759, 17 A.3d 30 (2011). Put differently, it appears that the commissioner asks us to rewrite § 45a-655 by importing restrictions from subsection (d) into subsection (b) where none exists, which violates the well established maxim that, "[a]s a general matter, this court does not read language into a statute.
**315 ... [W]e are bound to interpret legislative intent by referring to what the legislative text contains, not by what it might have contained." (Citation omitted; internal quotation marks omitted.) State v. George J. , 280 Conn. 551, 570, 910 A.2d 931 (2006), cert. denied, 549 U.S. 1326, 127 S. Ct. 1919, 167 L.Ed. 2d 573 (2007).
The commissioner, however, contends to the contrary, arguing that, under the plain language of § 45a-655(d), the conservator is precluded from paying spousal support in excess of that permitted under the Medicaid scheme, despite the existence of a preexisting Probate Court order mandating a greater support amount. We disagree. First, it is inconsistent with the plain language of the statute in two different ways. The use in § 45a-655 (d) of the conjunctive word "and" between the phrases "no conservator shall apply" and "no court shall approve the application" does not suggest a statutorily mandated change to an existing court order but, rather, imparts a limitation on the conservator's authority to file an application, and the court's authority to approve that application once made by the conservator, upon *360 the existence of certain conditions precedent-namely, an application for, or the receipt of, medical assistance. Put differently, had the legislature intended to limit the authority of the conservator independent of the Probate Court, it, as it did in defining the condition precedent in the preceding clause, could have used the disjunctive word "or" to link those terms. See, e.g., State v. Dennis , 150 Conn. 245, 248, 188 A.2d 65 (1963) ("[t]he use of the disjunctive 'or' between the two parts of the statute indicates a clear legislative intent of separability"). That this sentence governs only the actions of the conservator and the Probate Court in concert is further demonstrated by the structure of the statute, insofar as the first sentence of § 45a-655 (d) pertains only to the obligations of the conservator by herself, providing: "In the case of any person receiving public assistance, state **316 administered general assistance or Medicaid, the conservator of the estate shall apply toward the cost of care of such person any assets exceeding limits on assets set by statute or regulations adopted by the Commissioner of Social Services."
Second, as the Office of the Probate Court Administrator aptly points out in its amicus brief, the commissioner's interpretation, which would potentially require the conservator to act contrary to an existing Probate Court support order, puts the conservator in an "untenable" situation because "when the Probate Court has expressly authorized or approved specific conduct by the conservator, the conservator is not acting on behalf of the conservatee, but as an agent of the Probate Court." Gross v. Rell , 304 Conn. 234, 251, 40 A.3d 240 (2012) ; see also Elmendorf v. Poprocki , 155 Conn. 115, 118, 230 A.2d 1 (1967) (Probate Court "is primarily entrusted with the care and management of the ward's estate, and, in many respects, the conservator is but the agent of the court.... A conservator has only such powers as are expressly or impliedly given to him by statute.... In exercising those powers, he is under the supervision and control of the Probate Court." [Citations omitted.] ); Johnson's Appeal from Probate , 71 Conn. 590, 598, 42 A. 662 (1889) (noting that conservator "exercises his statutory power ... subject to [the Probate Court's] power to approve or disapprove of his action"); cf. Gross v. Rell , supra, at 254, 40 A.3d 240 (conservator is fiduciary of conservatee when action has not been approved or authorized by Probate Court). In the absence of clear and unambiguous statutory language nullifying the existing Probate Court order, that order remains effective; we decline to interpret statutes in a manner that would require an agent or officer of that court to disregard such an order.[18]
**317 *361 Although we agree with the commissioner that we must read § 45a-655 in conjunction with § 17b-261b, which sets out the obligations of the Probate Court to the commissioner with regard to applications for spousal support, such a reading does not dictate the result sought by the commissioner. Section 17b-261b implements the single state agency requirement under the federal Medicaid statutes; see 42 U.S.C. § 1396a (a) (5) (2012) ; insofar as it provides that the department "shall be the sole agency to determine eligibility for assistance and services under programs operated and administered by said department." General Statutes § 17b-261b (a). It also, however, contemplates the Probate Court having a role in that process, particularly with respect to the issuance of spousal support orders. Section 17b-261b (c) limits the authority of the Probate Court to approve an application for an order of community spousal support, providing: "No probate court shall approve an application for spousal support of a community spouse unless (1) notice is provided in accordance with subsection (b) of this section, and (2) the order is consistent with state and federal law."
**318 Section 17b- 261b (b), in addition to setting forth the obligations of "[a]ny person filing an application" and the Probate Court to provide notice of the application, the hearing on the application, and the court's order to the commissioner, specifically affords the "commissioner or a designee" the right to "appear at such hearing and [to] present the commissioner's position as to the application in person or in writing." As the Office of the Probate Court Administrator contends in its amicus brief, if the terms of § 45a-655 (d) effectively nullified any existing order of spousal support upon an application for Medicaid, there would be no need for § 17b-261b, which the legislature enacted nine years after § 45a-655 (d),[19] mandating that the commissioner receive notice and the opportunity to be heard in the first instance with respect to any application for spousal support. "In cases in which more than one [statutory provision] is involved, we presume that the legislature intended [those provisions] to be read together to create a harmonious body of law ... and we construe the [provisions], if possible, to avoid conflict between them." (Internal quotation marks omitted.) Cardenas v. Mixcus , 264 Conn. 314, 326, 823 A.2d 321 (2003) ; see also id., at 322-23, 823 A.2d 321 ("[w]e presume that laws are enacted in view of existing relevant statutes" [internal quotation marks omitted] ). Accordingly, the commissioner's suggested reading of the statutes at issue in this appeal would run afoul of the "basic tenet of statutory construction that the legislature [does] not intend to enact meaningless provisions....
**319 Because [e]very word and phrase [of a statute] is presumed to have meaning ... [a statute] must be construed, if possible, such that no clause, sentence or word is superfluous, void or insignificant." (Internal quotation marks *362 omitted.) Tomick v. United Parcel Service, Inc. , 324 Conn. 470, 483, 153 A.3d 615 (2016).
Indeed, the continued enforcement of an order rendered under § 45a-655 (b) is wholly consistent with federal law, as is required by § 17b-261b (c). The federal statute governing community spouse support sets forth a detailed formula for calculating the community spouse allowance; see 42 U.S.C. § 1396r-5 (d) (2) through (4) (2012) ; subject to the exception governing preexisting court orders. 42 U.S.C. § 1396r-5 (d) (5) (2012). That exception provides: "If a court has entered an order against an institutionalized spouse for monthly income for the support of the community spouse, the community spouse monthly income allowance for the spouse shall be not less than the amount of the monthly income so ordered." (Emphasis added.) 42 U.S.C. § 1396r-5 (d) (5) (2012). Congress' use of the words "has entered," stated in the present perfect tense, indicates that 42 U.S.C. § 1396r-5 (d) (5) contemplates only court orders in existence at the time of the eligibility determination, such as the Probate Court decree at issue in the present appeal.[20] See Schieffelin & Co. v. Dept. of Liquor Control , supra, 194 Conn. at 175, 479 A.2d 1191.
The sister state cases upon which the parties rely do not directly counsel a result with respect to the language **320 of our state statutes, but simply stand for the proposition that the relief available in the judicial forum is uniquely dependent on the state laws that intersect with the federal Medicaid statute. We do, however, find most persuasive M.E.F. v. A.B.F. , supra, 393 N.J. Super. at 543, 925 A.2d 12, a decision from New Jersey's intermediate appellate court that, in many ways, presents the mirror image of the present case. In M.E.F. , the court directly considered the "relationship between the '[court-ordered] support' and 'fair hearing' provisions of the [catastrophic coverage act] in determining the [minimum monthly needs allowance] of a community spouse who seeks an upward modification of the allowance provided by the state ...." Id., at 547, 925 A.2d 12. In that case, the institutionalized spouse had spent down his assets and was already receiving Medicaid. Id., at 548, 925 A.2d 12. Rather than challenge the agency's determination of her minimum needs allowance through the fair hearing process, the community spouse renewed a motion for support previously filed in state family court, with notice to the state's social services agency. Id., at 548-49, 925 A.2d 12. After reviewing the legislative history of the catastrophic coverage act, the New Jersey court stated that the "use of the past tense" in 42 U.S.C. § 1396r (d) (5) with respect to court-ordered support "suggests ... that a community spouse ... cannot, at this point, seek such an order, not having previously obtained one. Indeed, a strong argument can be made that the [court-ordered ] support provision is applicable only when such support has been obtained during spend-down and prior to a determination of Medicaid eligibility . Such an interpretation would be consistent with a Congressional concern, expressed in the *363 context of a discussion of the treatment of income, protection of income for the community spouse, and transfer of resources, that spouses not be worse off under proposed legislation than they were under existing law, which in some instances recognized spousal **321 support orders."[21] (Emphasis added.) Id., at 554, 925 A.2d 12. The court nevertheless declined to resolve whether the fair hearing and court order provisions present two parallel alternatives for relief, given the posture of the case. Id., at 557, 925 A.2d 12. Instead, to avoid the potential for "forum shopping" and "parallel litigation," the court held that, once the community spouse "embarked upon the administrative path by receiving and challenging the [monthly needs allowance] provided to her, [she was] limited to that path until a final administrative determination has been reached."[22] *364 Id., at 557-59, 925 A.2d 12 ; see also **322 H.K. v. Division ofMedical Assistance & Health Services , 379 N.J. Super. 321, 329-31, 878 A.2d 16 (App. Div.) (declining to give effect to nonadversarial divorce order of support, rendered after filing of Medicaid application), cert. denied, **323 185 N.J. 393, 886 A.2d 663 (2005) ; Gomprecht v. Gomprecht , supra, 86 N.Y.2d at 49-52, 629 N.Y.S.2d 190, 652 N.E.2d 936 (family court required to apply minimum monthly needs and resource allowance standard under social services statute, along with "exceptional circumstances" standard for justification of increased support, in support action brought by community spouse against institutionalized spouse who was receiving Medicaid); Blumberg v. Dept. of Human Services , Docket No. M2000-00237-COA-R3-CV, 2000 WL 1586454, *2-3, *4 (Tenn. App. October 25, 2000) (rejecting social services agency's reliance on single state agency provision set forth in 42 U.S.C. § 1396a [a] [5], and holding that agency was "without the authority" to ignore family court order of support to the community spouse because, had Congress wanted to foreclose courts from setting community spouse allowance, "it could simply have stated in precise language that the administrative process is the only procedure available").
Finally, at oral argument before this court, certain colloquies suggested that this interpretation of §§ 17b-261b and 45a-655 (b) and (d), and might well result in potential inequities among Medicaid recipients and a greater drain on the public fisc, insofar as persons with greater access to professional estate planning services would have the ability to maximize the preservation of their assets and income simply by obtaining a spousal support order from the Probate Court prior to filing the institutionalized spouse's application for Medicaid.[23] The department is not, however, powerless to protect the public fisc from such estate planning maneuvers.
*365 We emphasize that the department has statutory standing to appear in Probate Court under § 17b-261b (b) in **324 response to any application for spousal support under § 45a-655,[24] and may advocate for the issuance of a spousal support order that reflects the potential for the future issuance of Medicaid benefits, consistent with "the circumstances of the case."[25] General Statutes § 45a-655 (b) ; see M.E.F. v. A.B.F. , supra, 393 N.J. Super. at 558, 925 A.2d 12 ("dual purposes" of catastrophic coverage act-"to ensure that the community spouse has sufficient, but not excessive, income and to ensure that individuals not be permitted to avoid payment of their own fair **325 share for long-term care-are certainly relevant considerations" with respect to family court's application of statute that "permit[s] consideration of spousal 'actual need,' ability to pay, and '[a]ny other factors which the court may deem relevant' "); see also Gomprecht v. Gomprecht , supra, 86 N.Y.2d at 52, 629 N.Y.S.2d 190, 652 N.E.2d 936 (concluding that "due regard to the circumstances of the respective parties" standard of spousal support statute requires consideration of Medicaid factors with respect to institutionalized spouse already receiving Medicaid, including requiring showing of "exceptional circumstances" to justify increase in support, and "[t]he fact that one spouse is institutionalized at the public expense is a factor to be considered"). Should the department still deem this process insufficient to protect the public fisc, it is always free to seek corrective legislative action.[26] *366 See, e.g., Morris v. Oklahoma Dept. of Human Services , 685 F.3d 925, 928 (10th Cir. 2012) ("[a]lthough we understand the district court's concerns regarding the exploitation of what can only be described as a loophole in the Medicaid statutes, we conclude that the problem can only be addressed by Congress"); accord Commissioner of Public Safety v. Freedom of Information Commission , supra, 312 Conn. at 550, 93 A.3d 1142 ("[t]he General Assembly retains the prerogative to modify or clarify [General Statutes] § 1-215 as it sees fit"). **326 Accordingly, insofar as the department failed to take advantage of its opportunity to seek appropriate relief in the Probate Court before an application for Medicaid was filed, we conclude that the Probate Court's spousal support order, rendered pursuant to the plain and unambiguous language of § 45a-655, was binding upon the department. The trial court, therefore, properly sustained the plaintiffs' administrative appeal.
The judgment is affirmed.
In this opinion the other justices concurred.

General Statutes § 45a-655 provides in relevant part: "(a) The conservator shall manage all the estate and apply so much of the net income thereof, and, if necessary, any part of the principal of the property, which is required to support the conserved person and those members of the conserved person's family whom the conserved person has the legal duty to support and to pay the conserved person's debts, and may sue for and collect all debts due the conserved person. The conservator shall use the least restrictive means of intervention in the exercise of the conservator's duties and authority.
"(b) Any conservator of the estate of a married person may apply such portion of the property of the conserved person to the support, maintenance and medical treatment of the conserved person's spouse which the Court of Probate, upon hearing after notice, decides to be proper under the circumstances of the case....
"(d) In the case of any person receiving public assistance, state-administered general assistance or Medicaid, the conservator of the estate shall apply toward the cost of care of such person any assets exceeding limits on assets set by statute or regulations adopted by the Commissioner of Social Services. Notwithstanding the provisions of subsections (a) and (b) of this section, in the case of an institutionalized person who has applied for or is receiving such medical assistance, no conservator shall apply and no court shall approve the application of (1) the net income of the conserved person to the support of the conserved person's spouse in an amount that exceeds the monthly income allowed a community spouse as determined by the Department of Social Services pursuant to [42 U.S.C. § 1396r-5 (d) (2) through (4) ], or (2) any portion of the property of the conserved person to the support, maintenance and medical treatment of the conserved person's spouse in an amount that exceeds the amount determined allowable by the department pursuant to [42 U.S.C. § 1396r-5 (f) (1) and (2) ], notwithstanding the provisions of [42 U.S.C. § 1396r-5 (f) (2) (A) (iv) ], unless such limitations on income would result in significant financial duress...."

The commissioner appealed from the judgment of the trial court to the Appellate Court, and we transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

General Statutes § 17b-261b provides: "(a) The Department of Social Services shall be the sole agency to determine eligibility for assistance and services under programs operated and administered by said department.
"(b) Any person filing an application with a probate court for spousal support, in accordance with section 45a-655, shall certify to that court that a copy of the application and accompanying attachments have been sent by regular mail, postage prepaid, to the Commissioner of Social Services. The probate court shall provide a notice of hearing to the commissioner at least fifteen business days prior to the hearing. The commissioner or a designee shall have the right to appear at such hearing and may present the commissioner's position as to the application in person or in writing. Any final order by the court on such application for spousal support shall be sent to the commissioner within seven business days of the order.
"(c) No probate court shall approve an application for spousal support of a community spouse unless (1) notice is provided in accordance with subsection (b) of this section, and (2) the order is consistent with state and federal law."

In granting the application, the Probate Court accepted Shea's representation that Marjorie "suffers from severe dementia that makes it impossible for her to manage her financial and business affairs without complete assistance."

In the application, Shea claimed that Marjorie "has the legal duty to support [her] spouse," and is "unable to provide for her own support, maintenance, and medical treatment." Shea also represented that, "[u]nless there is an unanticipated, major improvement [in her] physical, emotional and mental health, [Marjorie] will reside at a skilled nursing facility or a long-term care facility until her death."

Title 42 of the 2012 edition of the United States Code, § 1396r-5 (d) (5), provides: "If a court has entered an order against an institutionalized spouse for monthly income for the support of the community spouse, the community spouse monthly income allowance for the spouse shall be not less than the amount of the monthly income so ordered."

Dept. of Social Services, Uniform Policy Manual § 5035.30 provides:
"A. Use of Community Spouse Allowance (CSA)
"1. The CSA is used as an income deduction in the calculation of the [posteligibility] applied income of an institutionalized spouse (IS) only when the IS makes the allowance available to the community spouse (CS) or for the sole benefit of the CS....
"2. For the purpose of using a CSA, the [d]epartment considers a CS to include a spouse receiving home and community based services under a Medicaid waiver.
"B. Calculation of CSA
"1. The CSA is equal to the greater of the following:
"a. the difference between the Minimum Monthly Needs Allowance (MMNA) and the community spouse gross monthly income; or
"b. the amount established pursuant to court order for the purpose of providing necessary spousal support.
"2. The MMNA is that amount which is equal to the sum of:
"a. the amount of the community spouse's excess shelter cost as calculated in section 5035.30 [ (B) (3) ]; and
"b. 150 percent of the monthly poverty level for a unit of two persons.
"3. The community spouse's excess shelter cost is equal to the difference between his or her shelter cost as described in section 5035.30 [ (B) (4) ] and 30 [percent] of 150 percent of the monthly poverty level for a unit of two persons.
"4. The community spouse's monthly shelter cost includes:
"a. rental costs or mortgage payments, including princip[al] and interest; and
"b. real estate taxes; and
"c. real estate insurance; and
"d. required maintenance fees charged by condominiums or cooperatives except those amounts for utilities; and
"e. Standard Utility Allowance (SUA) used in the FS program for the community spouse.
"5. The MMNA may not exceed the greatest of either:
"a. the maximum MMNA; or
"b. an amount established through a [f]air [h]earing."

This determination had the concomitant effect of reducing Medicaid assistance in the form of payment to the long-term care facility by $898.45 monthly during that period.

Title 42 of the 2012 edition of the United States Code, § 1396r-5 (d), provides in relevant part: "Protecting income for community spouse
"(1) Allowances to be offset from income of institutionalized spouse
"After an institutionalized spouse is determined or redetermined to be eligible for medical assistance, in determining the amount of the spouse's income that is to be applied monthly to payment for the costs of care in the institution, there shall be deducted from the spouse's monthly income the following amounts in the following order:
"(A) A personal needs allowance (described in section 1396a [q] [1] of this title), in an amount not less than the amount specified in section 1396a (q) (2) of this title.
"(B) A community spouse monthly income allowance (as defined in paragraph [2] ), but only to the extent income of the institutionalized spouse is made available to (or for the benefit of) the community spouse.
"(C) A family allowance, for each family member, equal to at least [one-third] of the amount by which the amount described in paragraph (3)(A)(i) exceeds the amount of the monthly income of that family member.
"(D) Amounts for incurred expenses for medical or remedial care for the institutionalized spouse (as provided under section 1396a [r] of this title).
"In subparagraph (C), the term 'family member' only includes minor or dependent children, dependent parents, or dependent siblings of the institutionalized or community spouse who are residing with the community spouse.
"(2) Community spouse monthly income allowance defined
"In this section (except as provided in paragraph [5] ), the 'community spouse monthly income allowance' for a community spouse is an amount by which-
"(A) except as provided in subsection (e) of this section, the minimum monthly maintenance needs allowance (established under and in accordance with paragraph [3] ) for the spouse, exceeds
"(B) the amount of monthly income otherwise available to the community spouse (determined without regard to such an allowance).
"(3) Establishment of minimum monthly maintenance needs allowance
"(A) In general
"Each State shall establish a minimum monthly maintenance needs allowance for each community spouse which, subject to subparagraph (C), is equal to or exceeds-
"(i) the applicable percent (described in subparagraph [B] ) of [one-twelfth] of the income official poverty line (defined by the Office of Management and Budget and revised annually in accordance with section 9902 [2] of this title) for a family unit of 2 members; plus
"(ii) an excess shelter allowance (as defined in paragraph [4] ).
"A revision of the official poverty line referred to in clause (i) shall apply to medical assistance furnished during and after the second calendar quarter that begins after the date of publication of the revision.
"(B) Applicable percent
"For purposes of subparagraph (A) (i), the 'applicable percent' described in this paragraph, effective as of ...
"(iii) July 1, 1992, is 150 percent.
"(C) Cap on minimum monthly maintenance needs allowance
"The minimum monthly maintenance needs allowance established under subparagraph (A) may not exceed $1,500 (subject to adjustment under subsections [e] and [g] of this section).
"(4) Excess shelter allowance defined
"In paragraph (3) (A) (ii), the term 'excess shelter allowance' means, for a community spouse, the amount by which the sum of-
"(A) the spouse's expenses for rent or mortgage payment (including principal and interest), taxes and insurance and, in the case of a condominium or cooperative, required maintenance charge, for the community spouse's principal residence, and
"(B) the standard utility allowance (used by the State under section 2014 [e] of Title 7) or, if the State does not use such an allowance, the spouse's actual utility expenses,
"exceeds 30 percent of the amount described in paragraph (3) (A) (i), except that, in the case of a condominium or cooperative, for which a maintenance charge is included under subparagraph (A), any allowance under subparagraph (B) shall be reduced to the extent the maintenance charge includes utility expenses...."

The trial court also rejected the commissioner's argument that § 17b-261b (a), which renders the department the "sole agency" to administer Medicaid in Connecticut; see footnote 3 of this opinion; gives the department the exclusive right to determine the community spouse allowance. The trial court described this contention as "an absurd and untenable position" that would allow the department "to ignore the federal Medicaid statutory framework which [it is] obliged to follow pursuant to [§ 17b-261b ]." Specifically, the trial court concluded that the commissioner is required "to administer the Medicaid program in accordance with [federal law], which, in turn, explicitly require[s] the [community spouse allowance] to be not less than an amount ordered by a court." The trial court further emphasized that the commissioner was not without remedy in the Probate Court proceeding, insofar as § 17b-261b (b) requires notice to the commissioner and confers standing upon him to seek a provision in the Probate Court's order modifying its community spouse allowance "upon the application or receipt of Medicaid benefits by a conserved person."

Title 42 of the 2012 edition of the United States Code, § 1396r-5 (e) (2), provides: "Fair hearing
"(A) In general
"If either the institutionalized spouse or the community spouse is dissatisfied with a determination of-
"(i) the community spouse monthly income allowance;
"(ii) the amount of monthly income otherwise available to the community spouse (as applied under subsection [d] [2] [B] of this section);
"(iii) the computation of the spousal share of resources under subsection (c) (1) of this section;
"(iv) the attribution of resources under subsection (c) (2) of this section; or
"(v) the determination of the community spouse resource allowance (as defined in subsection [f] [2] of this section);
"such spouse is entitled to a fair hearing described in section 1396a (a)(3) of this title with respect to such determination if an application for benefits under this subchapter has been made on behalf of the institutionalized spouse. Any such hearing respecting the determination of the community spouse resource allowance shall be held within 30 days of the date of the request for the hearing.
"(B) Revision of minimum monthly maintenance needs allowance
"If either such spouse establishes that the community spouse needs income, above the level otherwise provided by the minimum monthly maintenance needs allowance, due to exceptional circumstances resulting in significant financial duress, there shall be substituted, for the minimum monthly maintenance needs allowance in subsection (d) (2) (A) of this section, an amount adequate to provide such additional income as is necessary.
"(C) Revision of community spouse resource allowance
"If either such spouse establishes that the community spouse resource allowance (in relation to the amount of income generated by such an allowance) is inadequate to raise the community spouse's income to the minimum monthly maintenance needs allowance, there shall be substituted, for the community spouse resource allowance under subsection (f) (2) of this section, an amount adequate to provide such a minimum monthly maintenance needs allowance."

On September 12, 2017, after oral argument before this court, we, sua sponte, invited the Office of the Probate Court Administrator to file an amicus curiae brief in this appeal. We are grateful to the Probate Court Administrator for filing a comprehensive brief that was responsive to the practical concerns raised at oral argument.

"A 'community spouse' is defined as 'an individual who resides in the community [and] who is married to an individual who resides in a medical facility or [long-term] care facility ....' " Burinskas v. Dept. of Social Services , 240 Conn. 141, 148 n.8, 691 A.2d 586 (1997).

"This amount is equal to 150 percent of [one-twelfth of] the official poverty line for a family of two plus an 'excess shelter allowance.' 42 U.S.C. § 1396r-5 (d) (3)." Burinskas v. Dept. of Social Services , 240 Conn. 141, 149 n.9, 691 A.2d 586 (1997) ; see also footnote 9 of this opinion.

"The income generated by the transferred resources is calculated as a percentage of those resources." Burinskas v. Dept. of Social Services , 240 Conn. 141, 150 n.10, 691 A.2d 586 (1997).

As the United States District Court for the District of Connecticut recently explained: "When an institutionalized spouse first applies [for] Medicaid, the [s]tate [a]gency totals the assets of both the institutionalized [spouse] and the community spouse 'as of the beginning of the first continuous period of institutionalization ... of the institutionalized spouse,' and divides that sum in half resulting in what is called a 'spousal share.' 42 U.S.C. § 1396r-5 (c) (1) (A).... This spousal share then becomes the basis for the [resource allowance]. 42 U.S.C. § 1396r-5 (f) (2). Thus, at the 'initial determination of eligibility,' the [s]tate Medicaid [a]gency treats 'the resources held by either the institutionalized spouse, the community spouse, or both' to be available to the institutionalized spouse, 42 U.S.C. § 1396r-5 (c) (2) (A), except that 'the [resource allowance] is considered unavailable to the institutionalized spouse ... [so] all resources [exceeding the resource allowance] (excluding a ... personal allowance reserved for the institutionalized spouse ...) must be spent before eligibility can be achieved.' [Wisconsin Dept. of Health & Family Services v. Blumer , 534 U.S. 473, 482-83, 122 S.Ct. 962, 151 L.Ed. 2d 935 (2002), citing 42 U.S.C. § 1396r-5 (c) (2) ]. In other words, aside from the calculated [resource allowance], all other community resources are considered in determining whether an institutionalized spouse is eligible for Medicaid, meaning that if the remaining resources exceed the Medicaid limit, the institutionalized spouse must 'spend down' the remaining resources to qualify.... This statutory scheme permits the institutionalized spouse to qualify for Medicaid while also allowing the community spouse to retain the [resource allowance] to support him[self] or herself." (Citations omitted; emphasis omitted; footnote omitted.) Fagan ex rel. Fagan v. Bremby , 244 F.Supp.3d 280, 282 (D. Conn. 2017).

See footnote 11 of this opinion.

Although not informative of our decision given the plain and unambiguous statutory language; see General Statutes § 1-2z ; it is nevertheless interesting to note the testimony of Audrey Rowe, the Commissioner of Income Maintenance, in support of the bill that ultimately was enacted as § 45a-655(d). See Public Acts 1992, No. 92-233, § 2. Commissioner Rowe's testimony in support of the bill provided that it "limits the authority of the Probate Court when dealing with an individual who has applied for, or receives, Medicaid. The [catastrophic coverage act] included provisions regarding the amount of income and assets that the spouse of an institutionalized Medicaid recipient was allowed to retain. The maximums ... are generous amounts when one realizes that the taxpayers are paying to maintain this individual's spouse in a nursing home.
"Federal law requires us to accept the amount set by court order, but permits us to define which courts have jurisdiction in this matter. This proposal establishes that definition. Situations are now occurring whereby probate courts are allowing higher income and asset allowances than those listed [previously]. This proposal limits their authority by preventing them from ordering higher settlements than we could allow under the law. We would, however, continue to recognize court orders from [the] Superior Court." Conn. Joint Standing Committee Hearings, Human Services, Pt. 4, 1992 Sess., pp. 1121-22.

The legislature enacted § 17b-261b in 2001. See Public Acts, Spec. Sess., June, 2001, No. 01-2, § 5. This legislation also amended General Statutes (Rev. to 2001) § 45a-655 (d) slightly to eliminate the Probate Court's authority to grant increased assets and income distributions if necessary to generate income, and allowed the court to grant such increases only to avert "significant financial distress." Public Acts, Spec. Sess., June, 2001, No. 01-2, § 6. This, of course, suggests that the legislature was well aware of § 45a-655 (d) when it enacted § 17b-261b, strengthening the long established presumption to that effect even further. See, e.g., Cardenas v. Mixcus , 264 Conn. 314, 322-23, 823 A.2d 321 (2003).

The commissioner contends that the decree rendered by the Probate Court in this case was not the kind of support order envisioned by Congress in its enactment of 42 U.S.C. § 1396r-5 (d) (5), insofar as it is representative of judicial overreach in its timing and use of Medicaid verbiage in setting forth the obligations of the payor spouse. Because neither federal nor state statutes create a look back period that restricts the timing of the court orders that would bind the commissioner in its Medicaid determination, the commissioner's criticism of the phrasing of the Probate Court's order ultimately exalts form over substance.

The New Jersey court deemed it "noteworthy" that the federal statutes governing Medicaid do "not authorize the community spouse to obtain a court order after eligibility has been determined, nor [do they] explicitly permit parallel proceedings. [They] merely [recognize] the effect of an order of support if it has been previously obtained ." (Emphasis added.) M.E.F. v. A.B.F. , supra, 393 N.J. Super. at 555, 925 A.2d 12.

We note that the reasoning of M.E.F. appears to have been undermined, but not expressly overruled, by a more recent decision from the same court. In R.S. v. Division of Medical Assistance & Health Services , 434 N.J. Super. 250, 272-75, 83 A.3d 868 (App. Div. 2014), the community spouse obtained a support order in family court prior to the filing of a Medicaid application by the institutionalized spouse; the administrative agency, however, declined to enforce the court order in determining the applicable resource allowance. In that case, the institutionalized spouse claimed that the "final agency decision, declining to enforce the [court order], violate[d] the plain language of [statutes] and regulations [governing the Medicaid program]." Id., at 261, 83 A.3d 868. Specifically, the institutionalized spouse requested "a strict application of the canons of statutory interpretation," contending that the "plain language" of the relevant statutes directed that the court order should "control the [agency's] review." Id., at 262, 83 A.3d 868. The court disagreed with these assertions and specifically held that "[s]uch a crabbed construction cannot stand as it abrogates the clear intent and purpose of the statute and obviates the [agency's] role in safeguarding limited Medicaid resources." Id. Rather, the court considered the legislative history of state and federal statutes governing the Medicaid program, and concluded that permitting the agency to disregard the court order would better effectuate "the broad federal and state goals of preventing the impoverishment of community spouses, while ensuring limited Medicaid resources are allocated prudently among those most in need." Id., at 264, 83 A.3d 868 ; see id., at 267, 83 A.3d 868 (positing that "the obvious intent of the [court order] was to maintain [community spouse's] lifestyle prior to ... institutionalization at the expense of the Medicaid program"). We find R.S. unpersuasive. The reasoning in that case ignores the tense of the verbs employed with respect to court orders in both federal and state legislation in attempting to reach a desired result, an approach to statutory analysis that, we note, would be wholly inconsistent with § 1-2z. We also note that the New Jersey Supreme Court has not yet considered the apparent inconsistency between R.S. and M.E.F.
We similarly disagree with Arkansas Dept. of Health & Human Services v. Smith , 370 Ark. 490, 491-92, 262 S.W.3d 167 (2007), in which a wife sought a judicial order of support prior to applying for Medicaid benefits to cover long-term care costs for her disabled husband. The Arkansas Supreme Court agreed with the argument of the state social services agency that, because the husband "had not applied for Medicaid and [the agency] had made no determination of his eligibility for benefits, [the husband and wife] had failed to exhaust their administrative remedies," thus, depriving the courts of subject matter jurisdiction. Id., at 491, 262 S.W.3d 167. The court rejected an interpretation of 42 U.S.C. § 1396r-5 as providing "two alternative means by which a community spouse might obtain a higher resource or income allowance," that would have given the wife "discretion to choose which method she wanted to use to obtain a higher allowance." Id., at 492, 262 S.W.3d 167. Emphasizing that the state social services agency is "the sole entity charged with administering Medicaid and determining eligibility for Medicaid benefits"; id., at 499, 262 S.W.3d 167 ; the court agreed with the agency's argument that the wife was not "entitled to proceed directly to ... court to obtain an order of support" and "was first required to avail herself of the administrative procedures set out in the [catastrophic coverage act]." Id., at 493, 262 S.W.3d 167. The court concluded that the reference to a preexisting court order of support in 42 U.S.C. § 1396r-5(d)(5) was "insufficient to confer jurisdiction, even [implicitly] .... This is particularly so when one considers that [42 U.S.C. § 1396r-5(d)(5) ] only generally reference[s] an order of spousal support ... [and does] not mention a court-ordered [community spouse resource allowance, community spouse monthly income allowance, or minimum monthly needs allowance]. One who wishes to apply for Medicaid must go through the process established by Congress and the [s]tate and cannot do an 'end run' around that process by seeking a preemptive court order of spousal support." Id., at 499, 262 S.W.3d 167. We disagree with the Arkansas court's construction of the federal statute and find it further distinguishable given the lack of a coordinate state statute like § 45a-655, which provides a clear delineation of the Probate Court's powers before and after an application for Medicaid. For these same reasons, we disagree with Alford v. Mississippi Division of Medicaid , 30 So.3d 1212, 1220-21 (Miss.), cert. denied, 562 U.S. 889, 131 S.Ct. 224, 178 L.Ed. 2d 135 (2010), which followed Arkansas Dept. of Health & Human Services v. Smith , supra, at 490, 262 S.W.3d 167, and Amos v. Estate of Amos , 267 S.W.3d 761, 763-64 (Mo. App. 2008), which employed a similar exhaustion analysis.

Indeed, counsel for the plaintiffs posited that, under existing law, this sequence would properly form the basis of a long-term care plan optimized to maximize the family's estate. Cf. M.E.F. v. A.B.F. , supra, 393 N.J. Super. at 558, 925 A.2d 12 ("recogniz[ing] the legitimacy of Medicaid spend-down plans as a means of apportioning assets in order to achieve Medicaid eligibility, even if, by the use of such plans, the funds reserved for public purposes are decreased").

Whether such appearances-which might take place in any one of our fifty-four probate districts-would pose an undue burden for the department was a topic of considerable discussion at oral argument before this court. The Probate Court Administrator's amicus brief assures us that such appearances would not be particularly onerous for the department or, by extension, the Office of the Attorney General. First, according to data maintained by the Probate Court Administrator, relatively few spousal support petitions are filed in Probate Court; in recent years, sixteen were filed in 2014, three were filed in 2015, and nine were filed in 2016. Second, the Probate Court Rules permit procedures allowing the commissioner to "participate in a hearing, conference or deposition by telephonic or other electronic means." Probate Court Rules § 66.1 (a). In determining whether to permit such a procedure in a particular case, the Probate Court may consider, inter alia, "the convenience of the parties and witnesses, including representatives of state agencies ...." Probate Court Rules § 66.1 (b) (8). Finally, the commissioner may be heard at the Probate Court hearing without using the Attorney General's resources because General Statutes § 45a-131 permits employees of certain state agencies, including the department, to participate in such proceedings without an attorney. Accordingly, it appears that the practical ramifications of our interpretation of the plain language of § 45a-655 are minimal, insofar as it is not unduly onerous for the department to participate in the Probate Court process with respect to requests for spousal support orders.

Indeed, as the department conceded at oral argument, § 17b-261b (b) necessarily confers upon the department standing to appeal from a Probate Court spousal support order to the Superior Court pursuant to General Statutes § 45a-186. See Buchholz's Appeal from Probate , 9 Conn. App. 413, 423, 519 A.2d 615 (1987) ("The plaintiff's statutory aggrievement is based upon the statutory provision which enabled the plaintiff to file an application for guardianship.... Because the right to file an application for guardianship was expressly given to any adult person, it naturally follows that an adult person who filed an application but was denied the guardianship should be afforded an opportunity to appeal from the Probate Court's decision." [Citation omitted.] ).

For example, in the wake of the Tennessee Court of Appeals' decision in Blumberg v. Dept. of Human Services , supra, 2000 WL 1586454, that state's legislature enacted Tenn. Code Ann. § 71-5-121, which requires "court [to] apply the standards utilized to determine [M]edicaid eligibility in this state, regardless of any state laws relating to community property or the division of marital property," in "all actions" seeking support of community spouse. In a later case, McCollom v. McCollom , Docket No. M2011-00552-COA-R3-CV, 2012 WL 1268296, *6-7 (Tenn. App. April 12, 2012), the court relied on that statute to conclude that a trial court considering a support application had improperly failed to apply the "exceptional circumstances resulting in significant financial distress" standard under 42 U.S.C. § 1396r-5 (e) (2) (B).