Per Curiam.
*376 In Docket No. 334732, respondent, the Department of Health and Human Services (DHHS), appeals as of right a protective order entered by the St. Clair County Probate Court, which ordered that all of Joseph Vansach, Jr.'s income be paid to his wife, Ramona Fenner-Vansach, for the rest of Joseph's life. In Docket No. 336267, the DHHS appeals a similar protective order, entered by the Eaton County Probate Court, directing that all income of Jerome R. Bockes be paid to his wife, Beverly Fay Bockes.[1] For the reasons explained in this opinion, we conclude that a probate court has the authority to enter a protective order providing support for a community spouse whose institutionalized spouse is receiving Medicaid benefits.[2]
*141 However, we also conclude that a probate court's authority to enter such support orders under the Estates and Protected Individuals Code (EPIC), MCL 700.1101 et seq ., does not include the power to enter an order preserving the community spouse's standard of living without consideration of the institutionalized spouse's needs and his or her patient-pay obligations under *377 Medicaid. Given that the orders in these cases were entered without considering Joseph's and Jerome's needs and their patient-pay obligations under Medicaid, we conclude that the probate courts abused their discretion by entering the orders at issue. We therefore vacate both support orders and remand for reconsideration of Beverly's and Ramona's need for support under the proper framework.
Both Joseph and Jerome are institutionalized individuals who receive Medicaid benefits to cover part of the costs of their healthcare. Their respective spouses-Ramona and Beverly-sought protective support orders under EPIC, claiming that they lacked sufficient income to meet their needs and that they were entitled to financial support from Joseph and Jerome. The DHHS opposed the petitions, asserting that Ramona and Beverly actually sought a judicial determination that they were each entitled to a larger community-spouse monthly income allowance (CSMIA) under Medicaid,[3] which would have the effect of decreasing the patient-pay amount that Joseph and Jerome contribute toward their care. According to the DHHS, the probate courts lacked the authority to make Medicaid determinations and to enter orders modifying the CSMIAs. Nevertheless, in each case, the probate court granted the petition and entered a support order requiring that 100% of the institutionalized spouse's monthly income be paid to the community spouse. The DHHS now appeals as of right in each case.
Generally speaking, these consolidated appeals ask us to consider whether, and under what circumstances, a community spouse whose institutionalized spouse is receiving Medicaid benefits may obtain a support order under EPIC in light of the federal Medicaid statutes *378 establishing CSMIAs. As a practical matter, a support order under EPIC may later be uses that order to obtain an increase in a community spouse's CSMIA and a corresponding decrease in the institutionalized spouse's patient-pay amount under Medicaid. Under Medicaid, there exists an administrative remedy for challenging the CSMIA, and the DHHS's basic position on appeal is that this administrative process is the sole avenue by which a community spouse may seek a modification of the CSMIA. Alternatively, assuming that the probate court has the authority to enter support orders with potential Medicaid implications, the DHHS argues that Ramona and Beverly failed to establish the necessary prerequisites for a support order under EPIC and that the probate courts abused their discretion by stripping Joseph and Jerome of all income so that Ramona and Beverly could maintain their current lifestyles. To provide context for our analysis of these issues, we begin with a brief overview of Medicaid's spousal-impoverishment provisions and the availability of a support order under EPIC.
I. MEDICAID'S SPOUSAL-IMPOVERISHMENT PROVISIONS
"The Medicaid program, 42 USC 1396 et seq., was established by Congress in 1965 as a cooperative federal-state program in *142 which the federal government reimburses the state for a portion of the costs of medical care for needy individuals." Cook v. Dep't of Social Servs. , 225 Mich.App. 318, 320, 570 N.W.2d 684 (1997). "Participation in Medicaid is essentially need-based, with states setting specific eligibility requirements in compliance with broad mandates imposed by federal statutes and regulations."[4] *379 Mackey v. Dep't of Human Servs. , 289 Mich.App. 688, 693, 808 N.W.2d 484 (2010). "To be eligible for Medicaid long-term-care benefits in Michigan, an individual must meet a number of criteria, including having $2,000 or less in countable assets." Hegadorn v. Dep't of Human Servs. Dir. , 320 Mich.App. 549, 552-553, 904 N.W.2d 904 (2017) (quotation marks and citation omitted), lv. gtd. 501 Mich. 984, 907 N.W.2d 578 (2018). Even if eligible for benefits, Medicaid recipients have an obligation to contribute to the cost of their care to the extent that they are financially able as determined on the basis of post-eligibility calculations of income. See 42 USC 1396a(a)(17) ; 42 USC 1396r-5(d)(1) ; 42 CFR 435.725 ; Kent County v. Dep't of Social Servs. , 149 Mich.App. 749, 751-752, 386 N.W.2d 663 (1986). However, Medicaid, "with all of its complicated rules and regulations, has also become a legal quagmire that has resulted in the use of several 'loopholes' taken advantage of by wealthier individuals to obtain government-paid long-term care they otherwise could afford." Mackey , 289 Mich.App. at 693-694, 808 N.W.2d 484.
The rules governing Medicaid are particularly complicated in cases involving married couples, who ''typically possess assets and income jointly and bear financial responsibility for each other...." Wisconsin Dep't of Health & Family Servs. v. Blumer , 534 U.S. 473, 479, 122 S.Ct. 962, 151 L.Ed.2d 935 (2002). Historically, because the income of both spouses and any jointly held assets were considered available to the institutionalized spouse for Medicaid purposes, "[m]any community spouses were left destitute by the drain on the couple's assets necessary to qualify the institutionalized spouse for Medicaid and by the diminution of the couple's income posteligibility to reduce the amount payable by Medicaid for institutional care." Id . at 480, 122 S.Ct. 962. However, in some cases, by titling assets solely in a community spouse's name, "couples with ample means *380 could qualify for assistance when their assets were held solely in the community spouse's name." Id .
Congress sought to address these problems with the enactment of the "spousal impoverishment" provisions of the Medicare Catastrophic Coverage Act of 1988 (MCCA), 42 USC 1396r-5. Blumer , 534 U.S. at 477, 480, 122 S.Ct. 962. Specifically, "Congress sought to protect community spouses from 'pauperization' while preventing financially secure couples from obtaining Medicaid assistance." Id . at 480, 122 S.Ct. 962. In other words, the basic goal of these spousal-impoverishment provisions was to assure that "the community spouse has a sufficient-but not excessive-amount of income and resources available." Id . (quotation marks and citation omitted). "To achieve this aim, Congress installed a set of intricate and interlocking requirements with which States must comply in allocating a couple's income and resources." Id .
Relevant to the present case, in addition to other rules regarding the allocation of resources, Medicaid provides various rules for the allocation of income between spouses for purposes of determining Medicaid eligibility as well as posteligibility income calculations that apply after an institutionalized *143 spouse is "determined or redetermined" to be eligible for medical assistance. See § 1396r-5(b) and (d).
Income allocation is governed by [ 42 USC 1396r-5(b) and (d). Covering any month in which "an institutionalized spouse is in the institution," § 1396r-5(b)(1) provides that "no income of the community spouse shall be deemed available to the institutionalized spouse." The community spouse's income is thus preserved for that spouse and does not affect the determination whether the institutionalized spouse qualifies for Medicaid. In general, such income is also disregarded in calculating the amount Medicaid will pay for the institutionalized spouse's care after eligibility is established.
*381 Other provisions specifically address income allocation in the period after the institutionalized spouse becomes Medicaid eligible. Section 1396r-5(b)(2)(A) prescribes, as a main rule, that if payment of income is made solely in the name of one spouse, that income is treated as available only to the named spouse (the "name-on-the-check" rule). Section 1396r-5(d) provides a number of exceptions to that main rule designed to ensure that the community spouse and other dependents have income sufficient to meet basic needs. Among the exceptions, § 1396r-5(d)(3) establishes for the community spouse a "minimum monthly maintenance needs allowance," or MMMNA. The MMMNA is calculated by multiplying the federal poverty level for a couple by a percentage set by the State. Since 1992, that percentage must be at least 150%, ... but the resulting MMMNA may not exceed $1,500 per month in 1988 dollars.... [ Blumer , 534 U.S. at 480-481, 122 S.Ct. 962.]
In an effort to ensure that a community spouse has income that meets the MMMNA, Medicaid allows a community spouse to receive a CSMIA. Id . at 481-482, 122 S.Ct. 962. Ordinarily, the CSMIA is calculated as set forth in § 1396r-5(d)(2), which states:
In this section (except as provided in paragraph (5) ), the "community spouse monthly income allowance" for a community spouse is an amount by which-
(A) except as provided in subsection (e) of this section, the minimum monthly maintenance needs allowance (established under and in accordance with paragraph (3) ) for the spouse, exceeds
(B) the amount of monthly income otherwise available to the community spouse (determined without regard to such an allowance).
Essentially, under § 1396r-5(d)(2), if the community spouse's income is less than the amount of the MMMNA, the CSMIA equals the amount of the shortfall. If either spouse is dissatisfied with this calculation of the CSMIA, they may obtain an administrative *382 hearing, § 1396r-5(e)(2)(A), and attempt to establish that the community spouse needs income above the MMMNA due to "exceptional circumstances resulting in significant financial duress," § 1396r-5(e)(2)(B). Central to the present case, aside from the calculation of the CSMIA under § 1396r-5(d)(2), as an alternative method for determining the CSMIA is provided in § 1396r-5(d)(5) which states: "If a court has entered an order against an institutionalized spouse for monthly income for the support of the community spouse, the [CSMIA] for the spouse shall be not less than the amount of the monthly income so ordered."
Ultimately, once the CSMIA has been determined, this amount is deducted from the institutionalized spouse's income and reallocated to the community spouse. Blumer , 534 U.S. at 481-482, 122 S.Ct. 962. See also § 1396r-5(d)(1)(B). "The provision *144 for this allowance ensures that income transferred from the institutionalized spouse to the community spouse to meet the latter's basic needs is not also considered available for the former's care. As a result, Medicaid will pay a greater portion of the institutionalized spouse's medical expenses than it would absent the CSMIA provision." Blumer , 534 U.S. at 482, 122 S.Ct. 962.
II. SUPPORT ORDERS UNDER EPIC
In Michigan, laws concerning the affairs of protected individuals and legally incapacitated individuals are set forth in EPIC.[5] See MCL 700.1201(a). In particular, *383 Article v. of EPIC, MCL 700.5101 et seq., contains statutes governing the protection of individuals under a disability.[6] In re Brody Conservatorship , 321 Mich.App. 332, 336, 909 N.W.2d 849 (2017). Under EPIC, probate courts clearly have the authority to enter protective orders, including the authority to enter orders providing money for "those entitled" to support from the incapacitated individual. MCL 700.5401(3)(b). See also MCL 700.5402(a) and (b). As a prerequisite to appointing a conservator or entering other protective orders, the probate court must make a finding of "cause" as provided in MCL 700.5401. In relevant part, this provision states:
(1) Upon petition and after notice and hearing in accordance with this part, the court may appoint a conservator or make another protective order for cause as provided in this section.
* * *
(3) The court may appoint a conservator or make another protective order in relation to an individual's estate and affairs if the court determines both of the following:
(a) The individual is unable to manage property and business affairs effectively for reasons such as mental illness, mental deficiency, physical illness or disability, chronic use of drugs, chronic intoxication, confinement, detention by a foreign power, or disappearance.
(b) The individual has property that will be wasted or dissipated unless proper management is provided, or money is needed for the individual's support, care, and welfare or for those entitled to the individual's support, and that protection is necessary to obtain or provide money. [ MCL 700.5401.]
*384 The prerequisites under this section must be established by clear and convincing evidence. MCL 700.5406(7) ; In re Bitttner Conservatorship , 312 Mich.App. 227, 237, 879 N.W.2d 269 (2015). If the prerequisites for a protective order are established by clear and convincing evidence, the standards applicable to the trial court in fashioning an order and exercising authority over the individual's property are set forth in MCL 700.5407 and MCL 700.5408. See Bittner , 312 Mich.App. at 237, 241-242, 879 N.W.2d 269.
*145 III. ANALYSIS
With this basic understanding of Medicaid and EPIC in mind, we turn to the issues in the present cases-namely, whether a community spouse may seek a support order under EPIC to obtain income from an institutionalized spouse who is receiving Medicaid benefits and, if so, what prerequisite determinations must be made under EPIC to merit such an order. The DHHS challenges the propriety of such orders on a number of grounds, asserting (1) that the probate courts lack jurisdiction to enter support orders that will effectively result in a redetermination of the CSMIA, (2) that the probate courts' authority to enter support orders is preempted by federal law in cases involving an institutionalized spouse receiving Medicaid benefits, and (3) that the orders in these cases were entered without a proper showing of the prerequisites in MCL 700.5401(3)(b) for such an orders. We address each of these arguments in turn.
A. STANDARDS OF REVIEW
Whether a court has subject-matter jurisdiction is a question of law, reviewed de novo on appeal. Usitalo v. Landon , 299 Mich.App. 222, 228, 829 N.W.2d 359 (2013).
*385 Likewise, "[w]hether a federal statute preempts state law is a question of law that we review de novo." TerBeek v. City of Wyoming , 297 Mich.App. 446, 457, 823 N.W.2d 864 (2012), aff'd 495 Mich. 1, 846 N.W.2d 531 (2014). Questions of statutory interpretation are also reviewed de novo. Salem Springs, LLC v. Salem Twp. , 312 Mich.App. 210, 216, 880 N.W.2d 793 (2015).
In comparison, "appeals from a probate court decision are on the record, not de novo." In re Temple Marital Trust , 278 Mich.App. 122, 128, 748 N.W.2d 265 (2008). We review a trial court's factual findings for clear error, In re Townsend Conservatorship , 293 Mich.App. 182, 186, 809 N.W.2d 424 (2011), while it's dispositional rulings, including a decision to enter a protective order, are reviewed for an abuse of discretion, see Bittner , 312 Mich.App. at 235-236, 879 N.W.2d 269. "A finding is clearly erroneous when a reviewing court is left with a definite and firm conviction that a mistake has been made, even if there is evidence to support the finding." Id . at 236, 879 N.W.2d 269 (quotation marks and citation omitted). "An abuse of discretion occurs when the court's decision falls outside the range of reasonable and principled outcomes." Id . at 235, 879 N.W.2d 269. A trial court may also abuse its discretion by failing to operate within the correct legal framework. See People v. Kelly , 317 Mich.App. 637, 643, 895 N.W.2d 230 (2016).
B. JURISDICTION
On appeal, the DHHS first argues that the probate courts lack jurisdiction to enter protective orders in cases involving a community spouse's efforts to obtain additional income from an institutionalized spouse. The DHHS contends that such requests are in actuality a challenge to the CSMIA, and the DHHS asserts that the probate courts lack authority to make *386 Medicaid determinations or to alter a community spouse's CSMIA. According to the DHHS, as the agency charged with administering Medicaid in Michigan, it has exclusive jurisdiction over challenges to CSMIAs because those issues are subject to administrative proceedings under § 1396r-5(e)(2)(B).
"Subject-matter jurisdiction concerns a court's abstract power to try a case of the kind or character of the one pending and is not dependent on the particular facts of a case."
*146 Harris v. Vernier , 242 Mich.App. 306, 319, 617 N.W.2d 764 (2000). When a state agency is "endowed with exclusive jurisdiction" over a matter, courts cannot exercise jurisdiction over those same areas. In re Harper , 302 Mich.App. 349, 353, 839 N.W.2d 44 (2013). Rather, an individual must exhaust any available administrative remedies before a court may exercise jurisdiction over the matter. Id . at 353, 356, 839 N.W.2d 44.
As noted, when a community spouse is dissatisfied with the amount of the CSMIA, he or she may obtain an administrative hearing, § 1396r-5(e)(2)(A)(i ), and attempt to establish that he or she needs additional income ''due to exceptional circumstances resulting in significant financial duress," § 1396r-5(e)(2)(B). As the agency charged with administering Medicaid in Michigan, the DHHS has the power "to hold and decide hearings." MCL 400.9. And an individual dissatisfied with the administrative results may seek judicial review in circuit court. MCL 400.37 ; MCL 24.303. Certainly, there are administrative remedies available under Medicaid to a community spouse who wishes to obtain additional income from an institutionalized spouse.
However, contrary to the DHHS's arguments, the Medicaid provisions providing for administrative proceedings *387 do not confer exclusive jurisdiction on the DHHS with regard to income allocation between spouses. Instead, the federal Medicaid statutes plainly acknowledge that courts may have jurisdiction to enter a support order and that this support order will affect the calculation of the CSMIA. In particular, the possibility of courts having jurisdiction is recognized in § 1396r-5(d)(5), which states that "[i]f a court has entered an order against an institutionalized spouse for monthly income for the support of the community spouse, the [CSMIA] for the spouse shall be not less than the amount of the monthly income so ordered." Like several of our sister states to have considered the meaning of § 1396r-5, we do not read this statute as conferring jurisdiction on any particular court or as requiring states to establish a judicial process for obtaining support orders as an alternative to the mandated administrative remedies. See Alford v. Mississippi Div. of Medicaid , 30 So.3d 1212, 1221 (Miss. 2010) (reiterating the doctrines of primary jurisdiction and exhaustion of administrative remedies and holding that the language of law does not confer parallel jurisdiction on state courts); Amos v. Estate of Amos , 267 S.W.3d 761, 764 (Mo.App. 2008) (concluding that the state agency has primary jurisdiction over initial eligibility determinations and that a plaintiff must exhaust administrative remedies before a court has jurisdiction); Arkansas Dep't of Health & Human Servs. v. Smith , 370 Ark. 490, 499, 262 S.W.3d 167 (2007) (holding that a state agency has sole authority over determining Medicaid eligibility and that courts may exercise jurisdiction after exhaustion of administrative remedies).[7] However, by recognizing the possibility that a court may have entered an *388 order of support, § 1396r-5(d)(5) acknowledges that there can be courts with jurisdiction to enter support orders; and by requiring the CSMIA to be calculated based on these court support orders, § 1396r-5(d)(5) makes plain that Medicaid did not establish administrative remedies as the sole means of relief or abolish any court's jurisdiction to enter a support order. See MEF v. ABF , 393 N.J.Super. 543, 555-556, 925 A.2d 12 (2007) ; *147 In re Tyler Estate , unpublished order of the Superior Court of the District of Columbia, entered May 30, 2002 (Docket No. 246-00), 2002 WL 1274125, pp. 2-3, 6 ; Gomprecht v. Gomprecht , 86 N.Y.2d 47, 52, 629 N.Y.S.2d 190, 652 N.E.2d 936 (1995). The relief available in the judicial forum "is uniquely dependent on the state laws that intersect with the federal Medicaid statute." Valliere v. Comm'r of Social Servs. , 328 Conn. 294, 320, 178 A.3d 346 (2018).[8] In short, the statutory language governing Medicaid does not create an exclusive administrative remedy; rather, it acknowledges the possibility of judicial spousal-support orders, and the question whether a court has jurisdiction turns on the court's authority to enter support orders under state law.
In this case, the basic question thus becomes whether probate courts in Michigan have jurisdiction to enter an order of support requiring payment of one spouse's income to another. "Probate courts are courts of limited jurisdiction," and their jurisdiction is defined "entirely by statute." In re Geror , 286 Mich.App. 132, 133, 779 N.W.2d 316 (2009) (quotation marks and citations omitted). See also Const. 1963, art. 6, § 15. The *389 probate court's jurisdiction to enter an order of support in a case involving a protected individual is established by EPIC. Pursuant to MCL 700.5402 :
After the service of notice in a proceeding seeking a conservator's appointment or other protective order and until the proceeding's termination, the court in which the petition is filed has the following jurisdiction:
(a) Exclusive jurisdiction to determine the need for a conservator or other protective order until the proceeding is terminated.
(b) Exclusive jurisdiction to determine how the protected individual's estate that is subject to the laws of this state is managed, expended, or distributed to or for the use of the protected individual or any of the protected individual's dependents or other claimants.
Under these provisions, the probate courts clearly have subject-matter jurisdiction to enter a protective order directing the distribution of a protected individual's income ''to or for the use of ... any of the protected individual's dependents or other claimants."[9] MCL 700.5402(b). Accordingly, the DHHS's jurisdictional arguments are without merit.
*390 C. PREEMPTION
Next, contrary to the DHHS's arguments, Medicaid and the spousal-impoverishment *148 provisions do not preempt EPIC's provisions allowing probate courts to enter support orders. "The Supremacy Clause of the United States Constitution gives Congress the authority to preempt state laws." Packowski v. United Food & Commercial Workers Local 951 , 289 Mich.App. 132, 139, 796 N.W.2d 94 (2010). "There are three types of federal preemption: express preemption, conflict preemption, and field preemption." Id . at 140, 796 N.W.2d 94. In this case, the DHHS claims that there exists conflict preemption, specifically "obstacle conflict preemption," which occurs "when state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." Ter Beek , 297 Mich.App. at 458, 823 N.W.2d 864 (quotation marks and citation omitted). According to the DHHS, the probate court's authority under EPIC to enter support orders for a community spouse eviscerates the intent of the spousal-impoverishment provisions of § 1396r-5.
To determine whether EPIC stands as an obstacle to the full accomplishment of the spousal-impoverishment provisions, we begin by considering Congress's purposes and objectives. Ter Beek , 297 Mich.App. at 460, 823 N.W.2d 864. As noted, by enacting the spousal-impoverishment provisions, Congress sought to ensure that community spouses had sufficient, but not excessive, income and resources; that is, Congress sought to prevent community spouses from being pauperized while also preventing financially secure couples from obtaining Medicaid assistance. Blumer , 534 U.S. at 480, 122 S.Ct. 962. These purposes are accomplished through the spousal-impoverishment statutes that provide "intricate and interlocking requirements" for allocating a couple's income and resources. Id .
*391 Notably, as discussed, one of the statutes enacted by Congress was § 1396r-5(d)(5), which expressly recognizes that "[i]f a court has entered an order against an institutionalized spouse for monthly income for the support of the community spouse, the [CSMIA] for the spouse shall be not less than the amount of the monthly income so ordered." By enacting this provision, Congress specifically provided that a state court's order can affect the amount of an individual's CSMIA, and thus we can only conclude that EPIC's provisions allowing the probate court to enter support orders are consistent with Congress's objectives and purposes in enacting Medicaid and the spousal-impoverishment provisions.[10] Accordingly, EPIC does not constitute an obstacle to the full accomplishment of Medicaid and the spousal-impoverishment provisions. The DHHS's obstacle-conflict-preemption arguments are without merit.
D. STANDARDS FOR SUPPORT ORDERS UNDER EPIC
Finally, having determined that probate courts generally have authority under EPIC to enter orders to provide support for community spouses, we turn to the DHHS's argument that the orders in these cases were improperly entered because Ramona and Beverly failed to establish the prerequisites under MCL 700.5401(3)(b) by clear and convincing evidence.[11] In *392 particular, *149 the DHHS argues that Ramona and Beverly failed to show that they need money for their support, and the DHHS asserts that they cannot show a need for money given that the CSMIA is designed to ensure that they have sufficient income. According to the DHHS, the probate courts abused their discretion by using support orders to bypass Medicaid's requirements and by failing to acknowledge that Joseph and Jerome need their incomes to meet their existing patient-pay obligations under Medicaid.
Although we have determined that the probate courts have the authority under EPIC to enter orders to provide support for community spouses whose spouses are institutionalized and receiving Medicaid benefits, that authority is constrained by the standards in EPIC. Thus, to determine the probate court's authority we begin with EPIC's statutory language. As noted, under a probate court may enter a protective order if the court determines that both of the following have been shown by clear and convincing evidence:
(a) The individual is unable to manage property and business affairs effectively for reasons such as mental *393 illness, mental deficiency, physical illness or disability, chronic use of drugs, chronic intoxication, confinement, detention by a foreign power, or disappearance.
(b) The individual has property that will be wasted or dissipated unless proper management is provided, or money is needed for the individual's support, care, and welfare or for those entitled to the individual's support, and that protection is necessary to obtain or provide money. [ MCL 700.5401(3). See also Bittner , 312 Mich.App. at 237, 879 N.W.2d 269.]
There can be no legitimate dispute that Subdivision (a) has been shown with respect to Joseph and Jerome. Both men are institutionalized individuals suffering from dementia, and they are unable to manage their own affairs.[12] The real issue in this case relates to Subdivision (b).
*150 The relevant language of MCL 700.5401(3)(b) makes clear that a protective order can be entered when money is "needed" for someone "entitled to the individual's support," provided that the entry of a protective *394 order is "necessary to obtain or provide money."[13] Plainly, to warrant a protective order under this provision, there must be a showing of need. That is, there must be a showing that money is necessary or required. See Merriam-Webster's Collegiate Dictionary (11th ed.) (defining ''need''). Further, the person claiming a need must be someone "entitled to the [incapacitated] individual's support." In general, married persons are entitled to support from their spouses. See MCL 750.161. Consequently, on a proper showing, a probate court may authorize funds for the support of a protected individual's spouse.[14] See In re Buckley's Estate , 330 Mich. 102, 108, 47 N.W.2d 33 (1951).
In considering whether money is "needed" for the "support" to which a spouse is "entitled," we acknowledge *395 that the duty to support a spouse is not discharged "by furnishing only enough money to buy sufficient food to keep body and soul together." People v. Beckman , 239 Mich. 590, 592, 214 N.W. 950 (1927). We are not, therefore, suggesting that a showing of need under MCL 700.5401(3)(b) requires a determination that the spouse requesting support lacks even the basic necessities of life. However, we emphasize that an entitlement to support does not necessarily guarantee that a spouse may enjoy a particular standard of living regardless of the protected individual's means and circumstances. To the contrary, in Michigan, the obligation to support a spouse is contingent on the assumption that the spouse providing support has sufficient financial ability to provide that assistance. See MCL 750.161 ; Szatynski v. Szatynski , 327 Mich. 613, 617, 42 N.W.2d 758 (1950) ("[B]ecause of his marital obligation, the duty is upon defendant husband to furnish to the extent of his ability a home and other needs for plaintiff." (emphasis added). And the level of "support" required is generally recognized as being that which is "reasonably consistent" with the supporting spouse's *151 "own means and station." Root v. Root , 164 Mich. 638, 645, 130 N.W. 194 (1911). In other words, it cannot reasonably be expected that one spouse should become impoverished in order for the other spouse to maintain his or her standard of living. See Myland v. Myland , 290 Mich.App. 691, 695, 804 N.W.2d 124 (2010) (reviewing spousal support award in an appeal from divorce judgment).
In the context of a petition for a protective order under MCL 700.5401(3)(b), it follows that a finding that money is needed for a spouse entitled to support from the protected individual requires consideration of the requesting spouse's needs and resources as well as the protected individual's needs and circumstances.
*396 The spouse requesting support must make a showing of need-not merely a desire to maintain a current standard of living without regard to the other spouse's circumstances. Whether the community spouse is "entitled" to "support" will depend on all the facts and circumstances, including the incapacitated individual's financial means and ability to provide assistance. For instance, when crafting a protective order, the probate court should consider the protected individual's "foreseeable needs," the interests of the protected individual's creditors, and the interests of the protected individual's dependents. See MCL 700.5408. A probate court considering a protective order should also bear in mind that the protected individual has the right to acquire, enjoy, and dispose of his or her own property. Bittner , 312 Mich.App. at 242, 879 N.W.2d 269. Weighing the various concerns will obviously depend on the facts of each case, but a protected individual's rights and interests can never be totally disregarded in an effort to provide for his or her spouse. In other words, a community spouse cannot make a showing of "need" and is not "entitled to the [incapacitated] individual's support" merely to maintain his or her current lifestyle when providing money to the spouse will leave the incapacitated individual entirely destitute and unable to meet his or her own needs.
In cases in which an institutionalized spouse is receiving Medicaid benefits, weighing both spouses' needs and circumstances requires consideration of those needs and circumstances as they actually exist under Medicaid. See Gomprecht , 86 N.Y.2d at 52, 629 N.Y.S.2d 190, 652 N.E.2d 936 ("The fact that one spouse is institutionalized at the public expense is a factor to be considered."); MEF , 393 N.J. Super. at 558, 925 A.2d 12 (recognizing that Medicaid's aims are certainly relevant considerations-"to ensure that the community spouse has sufficient, but not excessive, *397 income and to ensure that individuals not be permitted to avoid payment of their own fair share for long-term care"); Tyler , unpub. order at 11 (concluding that a court support order could not be entered "without regard to the Federal Medicaid Statute"). See also In re Johnson's Estate , 286 Mich. 213, 223, 281 N.W. 597 (1938) (recognizing that whether the action would leave an incompetent individual as a "public charge" is relevant in an action regarding the individual's property). Consequently, along with any other relevant facts and circumstances, probate courts must consider the CSMIA and any other resources available to the community spouse, the community spouse's "need" for additional support beyond the CSMIA, and the institutionalized spouse's need for income to meet the patient-pay amount related to his or her medical care under Medicaid. Importantly, a probate court's consideration of the couple's circumstances in light of Medicaid cannot involve a fallacious assumption that the institutionalized *152 spouse should receive 100% free medical care under Medicaid or an assumption that a community spouse is entitled to maintain his or her standard of living.[15] In actuality, Medicaid is a need-based program, and a Medicaid recipient is obligated to contribute to his or her care. See *398 Mackey , 289 Mich.App. at 693, 808 N.W.2d 484. The unfortunate reality is that medical costs and increased expenses related to illness may affect both spouses, see Mathews v. De Castro , 429 U.S. 181, 188, 97 S.Ct. 431, 50 L.Ed.2d 389 (1976), and even with the enactment of the spousal-impoverishment provisions, Medicaid provides no guarantee that a community spouse will enjoy "the same standard of living-even if reasonable rather than lavish by some lights-that he or she enjoyed before the institutionalized spouse entered a nursing home." Balzarini v. Suffolk County Dep't of Social Servs. , 16 N.Y.3d 135, 144, 919 N.Y.S.2d 474, 944 N.E.2d 1113 (2011). "The trade-off for a married couple, of course, is that the institutionalized spouse's costly nursing home care is heavily subsidized by the taxpayer...." Id . Having made this trade-off, a community spouse is not entitled to have the probate court simply disregard Medicaid, ignore the institutionalized spouse's patient-pay amount, and impoverish the institutionalized spouse in order that the community spouse may maintain his or her standard of living without regard for the institutionalized spouse's needs and circumstances as they exist under Medicaid. Such a procedure is not contemplated by EPIC, and it is a gross misapplication of the probate court's authority to enter an order when money is "needed" for "those entitled to the [incapacitated] individual's support." See MCL 700.5401(3)(b) (emphasis added). Instead, the actual Medicaid-related realities facing the couple-all of Medicaid's pros and cons-become part of the facts and circumstances that the probate court when considering must consider whether to enter a support order for a community spouse under MCL 700.5401(3)(b). Ultimately, when a community spouse's institutionalized spouse receives Medicaid benefits and has a patient-pay amount, the *399 community spouse seeking a support order under EPIC must show by clear and convincing evidence that he or she needs money and is entitled to the institutionalized spouse's support despite the CSMIA provided under Medicaid and the institutionalized individual's patient-pay amount under Medicaid.[16] *153 IV. APPLICATION
In both cases before us the probate courts entered orders awarding the community spouses 100% of the institutionalized spouses' monthly income, thereby leaving the institutionalized spouses destitute. These orders were entered to preserve the community spouses' standard of living without a consideration of the institutionalized spouses' needs and circumstances in light of Medicaid.
*400 In particular, in Docket No. 334732, the probate court applied a standard of "reasonableness," concluding that Ramona had demonstrated a "need for support" from Joseph because she had submitted a budget and none of her requests was "unreasonable." The trial court considered only Ramona's requests, and failed to weigh Joseph's needs and his existing patient-pay obligations. Indeed, the court disregarded the DHHS's Medicaid calculations, opining that these calculations did not affect the court's ability to enter a support order and that the DHHS's determinations were "not applicable" to the court's order; rather, the court's order would be applicable to the DHHS's future determinations.[17] Quite simply, the trial court misunderstood the significance of Medicaid in this context, proceeding on the assumption that the probate court had authority to grant any "reasonable" request for support without considering the institutionalized spouse's needs and patient-pay amount. As a result, the probate court operated within the wrong legal framework by failing to determine, by clear and convincing evidence, that Ramona needed money-not simply wanted it-and whether she was entitled to Joseph's support despite the CSMIA provided under Medicaid and despite Joseph's patient-pay amount under Medicaid. Thus, the trial court abused its discretion by ordering that Ramona receive additional support from Joseph because Joseph would be impoverished as a result.
Likewise, in Docket No. 336267, the probate court determined that Beverly needed support from Jerome.
*401 The court concluded that Beverly and Jerome were "not rich people" and that Beverly's request for income was "to maintain where she was" in terms of her standard of living. The court opined that EPIC provided the authority to provide support for Beverly "to maintain what they [had] without impoverishing [Beverly]...." However, missing from the probate court's analysis is an account of Jerome's needs and, in particular, a careful consideration of his patient-pay amount under Medicaid. As discussed, EPIC does not provide blanket authority to maintain a community spouse's standard of living without regard for the incapacitated *154 spouse's needs and circumstances, which in this case included a patient-pay amount because Jerome was a Medicaid recipient. The unfortunate reality is that both spouses may feel the financial effects of a spouse's institutionalization. However, a support order under EPIC cannot be used to impoverish an institutionalized spouse as an end-run around Medicaid. Rather, there should have been a determination, by clear and convincing evidence, that Beverly needed money-not simply wanted it-and that she was entitled to Jerome's support despite the CSMIA provided under Medicaid and Jerome's patient-pay obligations under Medicaid. By failing to operate within the correct framework and appropriately consider Jerome's needs as well as Beverly's, the court abused its discretion by entering an order that rendered Jerome destitute in order to maintain Beverly's standard of living.
V. CONCLUSION
In sum, probate courts have authority to enter orders requiring an institutionalized spouse to provide support for a community spouse. However, EPIC does *402 not give probate courts unfettered discretion to enter an order allowing the community spouse to maintain his or her current lifestyle without regard to the institutionalized spouse's needs and patient-pay obligations. In the cases before us, rather than consider the couples' needs and circumstances as they existed in light of Medicaid, the probate courts disregarded the patient-pay amounts and impoverished the institutionalized spouses so that the community spouses could maintain their standards of living. By failing to properly consider the implications of Medicaid in relation to the spouses' respective needs and circumstances, the probate courts operated under the wrong legal framework and abused their discretion.
Protective orders vacated and cases remanded for further proceedings. We do not retain jurisdiction.
O'Connell, P.J., and Hoekstra and K. F. Kelly, JJ., concurred.

The appeals have been consolidated "to advance the efficient administration of the appellate process." In re Joseph Vansach Jr. , unpublished order of the Court of Appeals, entered July 12, 2017 (Docket Nos. 334732 and 336267).

Title XIX of the Social Security Act, 42 USC 1396 et seq ., is commonly referred to as the Medicaid act. Mackey v. Dep't of Human Servs. , 289 Mich.App. 688, 693, 808 N.W.2d 484 (2010). In the Medicaid context, and as used in this opinion, the term "community spouse" refers to a spouse living at home, while the term "institutionalized spouse" refers to a spouse who has been institutionalized, usually in a nursing home. Wisconsin Dep't of Health & Family Servs. v. Blumer , 534 U.S. 473, 478, 122 S.Ct. 962, 151 L.Ed.2d 935 (2002).

42 USC 1396r-5(d)(2).

In Michigan, Medicaid is administered by the DHHS. See MCL 400.105 ; MCL 400.227.

A "protected individual" is a "minor or other individual for whom a conservator has been appointed or other protective order has been made...." MCL 700.1106(w ). " 'Incapacitated individual' means an individual who is impaired by reason of mental illness, mental deficiency, physical illness or disability, chronic use of drugs, chronic intoxication, or other cause, not including minority, to the extent of lacking sufficient understanding or capacity to make or communicate informed decisions." MCL 700.1105(a).

In this context, the term " '[d]isability' means cause for a protective order as described in [MCL 700.5401 ].'' MCL 700.1103(n).

Although not binding on this Court, caselaw from sister states may be considered as persuasive authority. Mettler Walloon, LLC v. Melrose Twp. , 281 Mich.App. 184, 221 n. 6, 761 N.W.2d 293 (2008).

See also Tyler , unpub. order at 9; Jenkins v. Fields , unpublished opinion of the United States District Court for the Southern District of New York, issued May 1, 1996, 1996 WL 221614 (Docket No. 95 CIV. 9603). Although Jenkins is a lower federal court decision, such decisions may be persuasive even though they are not binding on state courts. Abela v. Gen. Motors Corp. , 469 Mich. 603, 607, 677 N.W.2d 325 (2004).

To be clear, the probate court's authority in this context extends to entering support orders under EPIC; the probate court cannot actually alter a CSMIA or modify Medicaid patient-pay amounts. Admittedly, it may often be true that a community spouse seeking a support order to obtain income from an institutionalized spouse might well intend to use the probate court's support order to obtain a redetermination of the CSMIA under § 1396r-5(d)(5). See Schaltz & Mall, Probate Court Orders and Medicaid Community Spouse Allowances: The Elder Law Practitioner's Perspective (Annual Michigan Judicial Conference, October 2015). However, the practical Medicaid implications of entering a support order under EPIC in favor of a community spouse do not divest a probate court of jurisdiction to consider a request for a protective support order under MCL 700.5402. Indeed, as discussed, § 1396r-5(d)(5) contemplates the use of court support orders for calculation of the CSMIA.

Indeed, if the use of state court support orders for the calculation of CSMIAs is inconsistent with the overarching goals of Medicaid and the spousal impoverishment provisions, Congress created the inconsistency, and it is certainly not our role to ignore the text of the Medicaid statutes or to "create rules based on our own sense of the ultimate purpose of the law being interpreted...." James v. Richman , 547 F.3d 214, 219 (C.A.3 2008).

On appeal, Ramona and Beverly argue that the DHHS waived the ability to challenge the evidence supporting their requests for additional income because the DHHS did not seek to present evidence in the probate courts. Such an argument improperly attempts to shift the burden of proof to the DHHS and incorrectly assumes that the DHHS had some obligation to present evidence. In actuality, Ramona and Beverly bore the burden of presenting clear and convincing evidence to warrant the issuance of a protective order. See MCL 700.5406(7). Moreover, while the DHHS did not challenge the accuracy of Ramona's and Beverly's budgets, the DHHS plainly challenged whether they had shown that support orders should be entered, emphasizing, for example, that what Ramona might "like" to have is not necessarily the same as what she needed. More generally, in both cases, the DHHS contested the propriety of entering support orders so that Ramona and Beverly could maintain their lifestyles at taxpayer expense while Jerome and Joseph received Medicaid benefits. The DHHS has by no means waived its ability to contest whether support orders were merited under EPIC based on the evidence presented by Ramona and Beverly.

Joseph has a conservator, and Beverly manages Jerome's affairs under a power of attorney. Based on the conservatorship and the power of attorney, the DHHS argues that, under Bittner , 312 Mich.App. at 243, 879 N.W.2d 269, the requirements in MCL 700.5401(3)(a) have not been shown because Joseph and Jerome are essentially managing their financial affairs through others. This argument is without merit. In Bittner , the protected individual suffered from "irksome attendants to the aging process," such as difficulties with math and memory, and she compensated for these shortcomings by granting her daughter a durable power of attorney so that her daughter could assist her in managing her financial affairs. Id . at 239, 243, 879 N.W.2d 269. On these facts, this Court reversed the appointment of a full conservatorship and held that someone capable of managing his or her affairs with assistance did not necessarily need a full conservatorship; rather, the court should have considered whether arrangements less intrusive than a full conservatorship would have sufficed to protect the individual's property. Id . at 242-243, 879 N.W.2d 269. In contrast to Bittner , Joseph and Jerome are not managing their affairs with assistance; instead, someone else is managing their affairs because they are unable to do so.

On appeal, the DHHS asserts that a court order is not "necessary to obtain or provide money" if there is a conservator or someone with a power of attorney who could authorize transfers of money to a spouse. Such an argument ignores the practical reality that such transfers cannot or will not be made when the institutionalized spouse's income is needed to meet his patient-pay amount. Unlike a conservator or someone with a power of attorney, as we have discussed, the probate court may enter an order of support despite the existing Medicaid calculations. In this regard, a probate court protective order can be "necessary to obtain or provide money."

We emphasize that the petitions in this case were made after the initial Medicaid determinations had been made and the petitions were premised on the assertion that additional income was needed to "support" Beverly and Ramona, presumably because § 1396r-5(d)(5) recognizes court orders "for the support of the community spouse." Thus, our analysis is focused on the issuance of orders for support under EPIC after an initial Medicaid eligibility determination has been made; we are not concerned with gift-giving beyond what is needed for support, or other attempts to use protective proceedings, before the initial Medicaid determination for Medicaid-planning purposes. See, e.g., In re Shah , 95 N.Y.2d 148, 159-162, 711 N.Y.S.2d 824, 733 N.E.2d 1093 (2000) ; Valliere , 328 Conn. at 323-324, 178 A.3d 346 ; Matter of Labis , 314 N.J. Super. 140, 147-149, 714 A.2d 335 (1998). In the circumstances before us, a Medicaid determination has already been made and the petitions involve requests for additional "support."

As noted earlier, the probate court's jurisdiction under EPIC does not extend to actually modifying the CSMIA or changing the patient-pay amount under Medicaid. Section 1396r-5(d)(5) recognizes that if a court "has entered" an order of support, the CSMIA cannot be less than the amount ordered by the court. However, this use of the order to change the CSMIA and thereby reduce the patient-pay amount is within the purview of the DHHS, not the probate court. When entering an order under EPIC, the probate court is bound by the existing Medicaid calculations, and the question before the probate court is whether-despite the existing circumstances, including the institutionalized spouse's patient-pay amount-money is "needed" to provide the community spouse with additional income to which he or she is "entitled" for "support." See MCL 700.5401(3)(b).

Some states have chosen to impose the administrative "exceptional circumstances" standard on this judicial determination, requiring the community spouse to show "exceptional circumstances resulting in significant financial duress" to obtain a support order for income from the institutionalized spouse. See, e.g., Gomprecht , 86 N.Y.2d at 52, 629 N.Y.S.2d 190, 652 N.E.2d 936 ; Va. Code Ann. 20-88.02:1(A)(2) ; Nev. Rev. Stat. Ann. 123.259(3)(b)(4). This language does not appear in EPIC, nor does § 1396r-5(d)(5) state that courts are required to use this standard. See Tyler , unpub. order at 9. Thus, despite the DHHS's assertion that such a standard should apply to any request for additional income by the community spouse, we will not read into EPIC or § 1396r-5(d)(5) language that does not appear there. If the DHHS wishes for this standard to apply in judicial proceedings, its only recourse is to seek legislative action implementing such a standard. See, e.g., Valliere , 328 Conn. at 325 & n. 26, 178 A.3d 346. Nevertheless, we note that, as a matter of common sense, when an incapacitated person needs to be institutionalized to receive full-time medical care, it would be an unusual case for the community spouse's circumstances to trump the institutionalized spouse's need for use of his or her income to pay the medical expenses, particularly when the community spouse has the benefit of the CSMIA. In other words, an institutionalized spouse's receipt of Medicaid and a community spouse's protection under the spousal impoverishment provisions generally weigh against the entry of a support order.

We note that the issue before us is the propriety of the probate courts entering supports order under EPIC. Questions regarding how those orders are used by the DHHS under § 1396r-5(d)(5) and whether the DHHS is obligated to honor those orders when redetermining Medicaid eligibility are not before us at this time. See MEF , 393 N.J. Super. at 554-555, 557, 925 A.2d 12.