*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

*In re* GUARDIANSHIP OF MARK KADANS and
*In re* CONSERVATORSHIP OF MARK KADANS.

MARK KADANS,

        Appellant,

v

JEFFERY KADANS, and JENNIFER KADANS,

        Appellees.

UNPUBLISHED
December 29, 2020

Nos. 352071
      352073
Oakland Probate Court
LC Nos. 2001-279252-GA
        2018-382857-CA

Before: STEPHENS, P.J., and SERVITTO and LETICA, JJ.

PER CURIAM.

In this consolidated appeal,[1] appellant, Mark Kadans, an adult, appeals as of right the denial on the merits, following a jury trial, of his petitions to terminate his guardianship (No. 352071) and his conservatorship (No. 352073), held by co-guardians and co-conservators, appellees, Jennifer and Jeffery Kadans. We affirm both orders.

## I. BACKGROUND

Mark had been under a guardianship intermittently since 2001. Mark sustained a traumatic brain injury when he was 13, which caused a mood disorder. Jennifer, who is Mark's sister-in-law, filed a petition for the appointment of a guardian for Mark in May 2018, alleging that Mark lacked the sufficient understanding or capacity to make or communicate decisions due to his mental illness and traumatic brain injury. Jennifer alleged that Mark's conduct included being arrested repeatedly, suffering mood swings, refusing medication, engaging in poor problem-

---

[1] *In Re Guardianship of Mark Kadans*; *In Re Conservatorship of Mark Kadans*, unpublished order of the Court of Appeals, entered February 10, 2020 (Docket Nos. 352071; 352073).

solving, being impulsive, and being hospitalized multiple times. After a hearing, the probate court appointed Jennifer and Jeffrey, Mark's brother, as Mark's co-guardians.

In May 2018, Jennifer also filed a petition for the appointment of a conservator over Mark, alleging the same general factual basis as the guardianship petition. Jennifer further alleged that Mark received social security disability payments and was the partial owner of inherited property. After a hearing, the probate court appointed Jennifer and Jeffrey as Mark's co-conservators.

In August 2019, Mark filed the instant petitions to terminate his guardianship and conservatorship, and exercised his rights to representation and to have a jury trial on the merits. At the time of the proceedings that followed, Mark was cared for and supervised at a facility.

The trial was held in November 2019. Mark testified about his capacity and abilities. Jennifer, proceeding without an attorney, garnered admissions from Mark on cross-examination. Jennifer also called Christopher Sheppard as a witness. Sheppard was a counselor at another facility and had worked with Mark during his intermittent stays over a six-year period.

The jury returned a verdict on the petitions, answering multiple questions. Regarding the conservatorship, the jury answered "yes" to the questions: (1) "Is Mark Kadans mentally ill, mentally deficient and/or does he suffer from a traumatic brain injury?"; and (2) "Due to mental illness/mental deficiency/traumatic brain injury, is Mark Kadans unable to manage his property and business affairs effectively?" Regarding the guardianship, the jury answered "yes" to the questions: (1) did Mark continue to be an incapacitated person?; (2) did a guardian continue to be necessary as a means of providing continuing care and supervision of Mark? In accordance with the jury's verdict, the probate court entered orders denying the petitions.

This consolidated appeal as of right followed.

## II. GUARDIANSHIP

First, Mark argues that the jury erred when it determined that he was still an incapacitated individual and continued to need a guardian. We disagree.

The factfinder must find by clear and convincing evidence the incapacitation and the need for a guardian. MCL 700.5306(1); *In Re Guardianship of Redd*, 321 Mich App 398, 408; 909 NW2d 289 (2017). "The clear-and-convincing-evidence standard is the most demanding standard applied in civil cases[.]" *In Re Conservatorship of Shirley Bittner*, 312 Mich App 227, 237; 879 NW2d 269 (2015) (quotation marks omitted). "Clear and convincing proof produces in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established, evidence so clear, direct and weighty and convincing as to enable the factfinder to come to a clear conviction, without hesitancy, of the truth of the precise facts in issue." *Id*. (quotation marks, alterations, and citation omitted). We review the jury's verdict under this heightened standard. See *In Re Guardianship of Redd*, 321 Mich App at 408.

"In Michigan, laws concerning the affairs of protected individuals and legally incapacitated individuals are set forth in [the Estates and Protected Individuals Code] EPIC," MCL 700.1101 *et seq*. *In re Estate of Vansach*, 324 Mich App 371, 382; 922 NW2d 136 (2018) (citing MCL 700.1201(a)).

In order to appoint an individual a guardian under EPIC, the factfinder must determine that: (1) the individual is incapacitated; and (2) the appointment is necessary to provide continuing care and supervision of the incapacitated individual. MCL 700.5306(1). Each finding must be supported separately on the record. MCL 700.5306(1). A proceeding pursuant to a petition to terminate a guardianship must follow the same procedures as a proceeding for a guardian's appointment. See MCL 700.5310(4). Under EPIC, the term " '[i]ncapacitated individual' means an individual who is impaired by reason of mental illness, mental deficiency, physical illness or disability, chronic use of drugs, chronic intoxication, or other cause, not including minority, to the extent of lacking sufficient understanding or capacity to make or communicate informed decisions." MCL 700.1105(a).

Here, there was clear and convincing evidence supporting the jury's verdict that Mark was both incapacitated and still required the care and supervision of a guardian.

As to Mark's incapacitation, the jury heard evidence that, when Mark was 13, he was involved in an automobile accident that resulted in a traumatic brain injury. And, although Sheppard was not currently providing any services to Mark, the jury heard evidence regarding the behaviors that resulted from Mark's impaired decision-making due to his traumatic brain injury. Particularly, the jury heard that, absent medication and treatment, Mark was unable to make informed decisions, created a danger to himself and others, such as when he disconnected the smoke detectors while he was cooking or jumped out of a moving car, and required inpatient psychiatric treatment on multiple occasions. Mark admitted that he had failed to confront his problems with drugs or alcohol, and, on one occasion, missed a guardianship proceeding because he was drinking and received a citation for driving under the influence. Mark also admitted that he had been banned from a yogurt shop and Oakland University because he engaged in stalking-like behavior, further evidencing his poor decision-making. This evidence supported the jury's determination, by clear and convincing evidence, that Mark was incapacitated as the result of his traumatic brain injury to the extent that he lacked the "sufficient understanding or capacity to make or communicate informed decisions." MCL 700.1105(a).

As to the need to provide continuing care and supervision, on appeal, Mark focuses on his testimony that he was able to live an independent life as he worked, held a driver's license, could prepare his own meals, had some college education, had a plan for what he would do when he was released from the facility, and was capable of making his own choices. However, Mark also admitted that he was supervised for eight hours a day at the facility and was required to be supervised by the facility's staff when he left. Mark further admitted that the facility did not permit him to work on a full-time basis. Sheppard also testified that Mark was resistant to taking medication without a guardianship, and, when unmedicated, a crisis ensued, ending with police contact, arrest, or psychiatric hospitalization. Moreover, there was evidence that Mark was formerly homeless when not under the care of a guardian, having lived in his car in California and requiring his father's business associate to drive him back to Michigan. Mark also admitted that he would not continue to seek treatment at the facility or take his medication, indicating that he

did not see the need for them. In short, despite Mark's favorable testimony,[2] there was clear and convincing evidence that Mark required treatment and medication administered at a facility, and that he would not seek such treatment without being supervised and cared for. Accordingly, there was clear and convincing evidence that Mark was an incapacitated individual who still required the care and supervision of a guardian.

## III. CONSERVATORSHIP

Second, Mark argues that there was no clear and convincing evidence supporting the jury's determination that Mark still required a conservator. We disagree.

The factfinder must find by clear and convincing evidence the need for a conservatorship. MCL 700.5406(7); *In Re Conservatorship of Bittner*, 312 Mich App at 236-237. We review the jury's verdict under this heightened standard. *Id*.

Relevantly under EPIC:

> The court may appoint a conservator or make another protective order in relation to an individual's estate and affairs if the court determines both of the following:
>
> (a) The individual is unable to manage property and business affairs effectively for reasons such as mental illness, mental deficiency, physical illness or disability, chronic use of drugs, chronic intoxication, confinement, detention by a foreign power, or disappearance.
>
> (b) The individual has property that will be wasted or dissipated unless proper management is provided, or money is needed for the individual's support, care, and welfare or for those entitled to the individual's support, and that protection is necessary to obtain or provide money. [MCL 700.5401(3)].

Slightly different, as to termination proceedings, EPIC provides:

> The protected individual, conservator, or another interested person may petition the court to terminate the conservatorship. A protected individual seeking termination is entitled to the same rights and procedures as in an original proceeding for a protective order. Upon determining, after notice and hearing, that the minority or disability of the protected individual has ceased, the court shall terminate the conservatorship. Upon termination, title to the estate property passes to the formerly protected individual or to successors subject to the provision in the order

---

[2] We must defer to the jury's credibility determinations as it had the opportunity to not only hear the testimony, but also to observe the witnesses as they testified. *Guerrero v Smith*, 280 Mich App 647, 669; 761 NW2d 723 (2008).

for expenses of administration and to directions for the conservator to execute appropriate instruments to evidence the transfer. [MCL 700.5431].

"[T]he appointment of a conservator for an individual may be appropriate even if the individual does not suffer from one of the conditions listed in MCL 700.5401(3)(a)." *In re Townsend Conservatorship*, 293 Mich App 182, 188; 809 NW2d 424 (2011). "But not any condition suffered by an individual will justify the appointment of a conservator." *Id.* "[A]ny circumstance not listed in MCL 700.5401(3)(a) that prohibits an individual from effectively managing his or her property and business affairs must be of a similar nature and quality as the eight conditions listed in the statute to justify the appointment of a conservator." *Id.* at 189.

"[C]lear and convincing evidence that a person is unable to manage property and business affairs effectively requires more than low marks on arithmetic or memory tests, or inconsistent ineptitude in balancing a checkbook." *In Re Conservatorship of Shirley Bittner*, 312 Mich App at 239 (quotation marks omitted). In *Bittner*, we determined that the requirements for a conservatorship were not present where the evidence supported that the individual at issue paid her bills in a timely manner, lived within her means, adequately managed her household, and, "maintain[ed] an adequate ability to make responsible decisions." *Id.* at 240.

Here, there was clear and convincing evidence supporting the jury's verdict that Mark was still under a disability that rendered him unable to manage his own affairs.

As discussed above, the jury heard evidence regarding Mark's traumatic brain injury and its effects on his behavior and decision-making capabilities. And, as also discussed above, there was evidence that, despite Mark's own testimony about his capabilities, this injury still greatly impacted his ability to function safely and independently. In short, there was clear and convincing evidence that Mark remained under a disability. See MCL 700.5431.

Also, Mark's traumatic brain injury and its consequences are of the nature and quality that "prohibit[ed] [him] from effectively managing his or her property and business affairs." *In re Townsend Conservatorship*, 293 Mich App at 188-189. The jury heard evidence that, before the establishment of the conservatorship, Mark had consistently required financial help from his father and that his father had otherwise supported him. Specifically, the jury heard admissions from Mark that his father purchased a car for him and that Mark lived on vacant property that his father owned. Moreover, before entering the facility, most of Mark's employment was connected to his father and Mark had been fired from an independent job due to inappropriate behavior. While Mark testified that he was currently able to work under limited supervision, he did so part-time because he needed to remain in the facility's program. The jury heard evidence that Mark's father also had to assist Mark in returning from California, where Mark was homeless when he lived on his own.

Furthermore, while there was evidence that Mark had a consistent income source from his social security disability payment and that he paid his cell phone bill from the funds not under the conservatorship's control, this was the only evidence that Mark had managed any of his affairs independently. This is undercut by Mark's admission that he was at least $16,000 in debt—debt that he had been delinquent in paying before the conservatorship was established. In short, there was no evidence that Mark was capable of fulfilling his plan to rent his own apartment and live

independently. Unlike *Bittner*, where there was evidence that the individual was able to pay her own bills, run her own household, and make responsible decisions, there was no evidence that Mark ever had the capability to manage his own affairs without a significant amount of outside help. *In Re Conservatorship of Shirley Bittner*, 312 Mich App at 240. Accordingly, there was clear and convincing evidence supporting the jury's verdict that Mark was still under a disability that rendered him incapable of managing his own affairs, and thus that the conservatorship should not be terminated.

Affirmed.


/s/ Cynthia Diane Stephens
/s/ Deborah A. Servitto
/s/ Anica Letica