*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

---

*In re* Guardianship of RONALD WILLIAM LAYTON.

---

BRIAN LAYTON,

      Petitioner-Appellant,

v

CHARLENE DISTLER,

      Respondent-Appellee,

and

KEITH LAYTON and JOHN LAYTON,

      Other Parties-Appellees.

UNPUBLISHED
August 11, 2022

No. 359851
Allegan Probate Court
LC No. 19-061553-GA

---

*In re* Conservatorship of RONALD WILLIAM LAYTON.

---

BRIAN LAYTON,

      Petitioner-Appellant,

v

CHARLENE DISTLER,

      Respondent-Appellee,

and

No. 360017
Allegan Probate Court
LC No. 19-061554-CA

---

KEITH LAYTON and JOHN LAYTON,

        Other Parties-Appellees.

_____

*In re* ESTATE OF JULIA ANNE LAYTON.

_____

BRIAN LAYTON,

        Appellant,

v                                                                                No. 360018
                                                                                 Allegan Probate Court
JOHN LAYTON and KEITH LAYTON,                        LC No. 19-061563-DE

        Appellees.

_____

*In re* RONALD WILLIAM LAYTON AND JULIA
ANN LAYTON TRUST.

_____

BRIAN LAYTON,

        Appellant,

v                                                                                No. 360019
                                                                                 Allegan Probate Court
CHARLENE DISTLER, Successor Trustee of the          LC No. 21-062981-TV
RONALD WILLIAM AND JULIA ANN LAYTON
TRUST, KEITH LAYTON, and JOHN LAYTON,

        Appellees.

_____

Before: RICK, P.J., and BOONSTRA and O'BRIEN, JJ.

PER CURIAM.

-2-

In these consolidated appeals,[1] appellant, Bryan Layton, appeals by right the probate court's order adopting a referee's findings and recommendations after an evidentiary hearing. The evidentiary hearing concerned—in part—the probate court's earlier decision to adopt an agreement between Bryan,[2] his brothers (Keith Layton and John Layton), and their father, Ronald Layton, in which they agreed to ratify a contested lease with modifications. In the original agreement, Ronald purportedly leased Bryan real property owned by the Ronald William Layton and Julia Ann Layton Trust (the Layton Trust) for 10 years without requiring the payment of rent. The agreed-to modifications provided that Bryan could continue occupying the real property only until Ronald's death. Unfortunately, Ronald died a few days after the parties reached the agreement and before the probate court signed the order implementing the agreement.

On appeal, Bryan primarily challenges the probate court's authority to adopt the agreement to modify the lease; he argues that the probate court should have enforced the original lease and allowed him to use the Layton Trust's property for a full 10 years from the date he claimed applied to the undated agreement. Bryan also argues that the probate court erred with respect to his motion to remove John as the trustee of the Layton Trust. For the reasons explained in this opinion, we conclude that Bryan has not identified any errors that warrant relief, and affirm in all dockets.

## I. BASIC FACTS

Ronald was born in 1933. He operated a dairy farm on his real property with his wife, Julia, for 60 years. Ronald and Julia had three sons: John, Keith, and Bryan.

Ronald and Julia established an estate plan in October 2002. They created the Layton Trust, and named John and Keith to be the successor trustees. Ronald and Julia provided that, upon their deaths, the trustee had to convey certain specified tracts of real property to each of their children. Ronald and Julia deeded all their real property to the trust at the same time.

Julia died on August 2, 2018, when she was 83 years of age.

In February, 2019, Bryan filed an ex parte motion with the probate court asking the court to appoint him to be Ronald's guardian and conservator. Among other things, Bryan alleged that Ronald had numerous health issues that required homecare help seven days a week; that he had been helping with Ronald's care; that, despite Keith and his wife, Janet, partially moving in with Ronald, they were not properly caring for him; and that John and Keith had frozen Ronald's bank accounts and were attempting to force Ronald into a nursing home against his wishes. Bryan asked the court to intervene because Ronald needed help with his care and protecting his finances from his children.

John and Keith opposed Bryan's motion for appointment to be Ronald's guardian and conservator, explaining that every action they had taken was to help care for and protect Ronald. For instance, they alleged that they took Ronald to his bank to remove funds to prevent Bryan from

---

[1] *In re Guardianship of Ronald William Layton*, unpublished order of the Court of Appeals, entered February 1, 2022 (Docket Nos. 359851, 360017, 360018, and 360019).

[2] For ease of reference, we refer to the members of the Layton family by their first names.

dissipating the funds for his personal use because, according to John and Keith, Bryan had a long history of getting Ronald to pay for things and then never reimbursing him. John and Keith asserted that they intended only to preserve the funds for Ronald's benefit. They also noted that Bryan had been living on and operating a farm rent-free on property that Ronald owned, and had been using Ronald's farm equipment as part of his personal business. They surmised that, in light of all this, Bryan was not a suitable guardian or conservator.

Upon receiving the parties' filings, the probate court appointed Sue Horton to serve as the guardian ad litem for Ronald and appointed Sharmila Rajani to represent Ronald.

Horton filed a report in March 2019. She wrote that she visited Ronald without anyone present and stated that he was "cordial, alert and engaged." She opined that, although there had been reports that he experienced confusion, Ronald did not lack "the mental ability to communicate informed decisions because of any illness or disability." While Horton believed that Ronald was mentally competent, she agreed that Ronald was dependent on others for around-the-clock physical assistance. She also noted that Ronald admitted that he had difficulty saying "no" to his sons and just wanted his sons to get along.

Horton's report also discussed concerning details she had uncovered about Bryan's treatment of Ronald. Through interviews, Horton learned that John and Keith had to secure Ronald's funds after they learned that Bryan had hired a lawyer and used $1,500 from Ronald's funds to pay for his lawyer's retainer. Horton was also told that Bryan sold Ronald's remaining cattle for about $3,600, but did not account for the money. Further, a homecare agency that had previously assessed Ronald's healthcare needs when Julia was still alive reported that Julia had not been getting along with Bryan, and an agency worker reported that Bryan neglected Ronald. The worker felt that Ronald invariably stood by Bryan and allowed Bryan to do whatever he wished.

Ultimately, Horton recommended that Ronald did not need a guardian or conservator, citing as evidence that Ronald had made adequate provision for his finances by making John his attorney-in-fact. Horton also noted that Ronald had made provision for his medical needs by making his sons patient advocates. Horton further opined that, even if Ronald needed a guardian or conservator, Bryan would not be a suitable candidate.

Rajani, who was appointed to represent Ronald, also filed a report with the probate court, in which she too indicated that there was no need for a guardian or conservator because Ronald had made adequate provisions for his care through the patient advocate and attorney-in-fact documents. She worried, however, that Ronald could execute a new power of attorney appointing Bryan to be his attorney-in-fact because, believing that John and Keith might place him in a nursing home, Ronald had been favoring Bryan, whose ability to act as a fiduciary was in question. Rajani opined that the best course of action would be to get John, Keith, and Bryan to mediate their disputes over Ronald's care and finances, observing that, if Ronald ever became incapacitated, then John, Keith, and Bryan—as patient advocates—would all have to agree on whether to place Ronald in a nursing home.

The probate court held a hearing on the petitions for guardianship and conservatorship. At the hearing, everyone agreed that Ronald was still mentally competent, and the probate court

suggested that the guardianship should not proceed. The court, nevertheless, felt that Ronald might need the court's assistance to resolve the disputes over his finances. The parties, excepting Bryan, agreed that a protective order was warranted.

The probate court entered a stipulated order effecting the agreed-upon measures on May 9, 2019. The order provided that Bryan had withdrawn the petitions for a guardian and conservator, and then ordered changes related to Ronald's funds and the funds in the Layton trust. First, the order stated that John and Keith would move all of Ronald's funds and the Layton Trust's funds to a bank account and that all withdrawals must be signed by two persons: Ronald and Janet. If Janet were unable to act, the order provided that John, Keith, or Bryan could cosign—in that order. Second, the order amended the Layton Trust to name Ronald and Janet as cotrustees. Third, the order amended the trust to reflect that John, Keith, and Bryan would be successor cotrustees— again in that order. Finally, the order provided that no further amendments to the Layton Trust could be made without court approval.

Bryan later contested whether Janet was properly administering Ronald's estate. As part of the ensuing dispute, it was revealed that Ronald possibly had late onset Alzheimer's disease and frailty syndrome in a geriatric patient, and that Bryan had suddenly claimed that he had a lease on Ronald's real property, though he would not produce a copy of the alleged lease.

At a hearing on the newly raised issues, Rajani informed the probate court that Ronald told her that he did not wish to change anything except to make John the sole trustee of the Layton Trust.

The probate court determined that, because Ronald was content with things so far, there was no basis for the court's involvement in the administration of the Layton Trust, but agreed that it would be appropriate to appoint John as the sole trustee in accordance with Ronald's wishes. In doing so, the court reminded the parties that its supervision was limited to the protective order and that Ronald had not been placed under guardianship or conservatorship; as such, it asked that future complaints come through Ronald's lawyer or in the form of a new petition for guardianship or conservatorship.

Thereafter, John moved to void the lease Bryan claimed he had on Ronald's real property. In an undated document that purported to be a lease agreement, Ronald allegedly leased to Bryan property owned by the Layton Trust for 10 years, rent-free, from the date of execution. John alleged that the lease was void because he—as the trustee—did not know about it, or execute it. John further alleged that Bryan had caused the real property to deteriorate into a state of disrepair and posted keep out signs everywhere.

In response, Bryan alleged that Ronald executed the lease in Spring 2019, which was when he was still trustee of the Layton Trust. He also denied that he had not maintained the property.

A referee held a hearing on issues involving the lease in January 2021. At the hearing, the lawyers indicated that the parties had come to an agreement to settle the dispute over the validity of the lease. John's lawyer stated that the parties had agreed to allow the lease to "continue in full force and effect until the demise of Ronald Layton." The agreement also provided that Bryan would have 60 days from Ronald's death to remove his personal property from those portions of

the real estate that would go to John and Keith upon Ronald's death. The lawyers all stated on the record that that was the agreement of their clients. The court stated that it would approve the order memorializing that agreement once submitted.

John's lawyer submitted the order under the seven-day rule on February 1, 2021. Ronald unfortunately died on February 5, 2021, and the probate court entered the stipulated order settling the lease dispute on February 9, 2021.

Then, in May 2021, Bryan petitioned to remove John as the personal representative of Julia's estate, alleging that John had not been administering the estate as required by law. On the same day, he petitioned the probate court to remove John as the Layton Trust's trustee on the ground that he had mismanaged the trust. Bryan also moved for relief from the stipulated order entered on February 9, 2021, asserting that the probate court never adjudicated Ronald to be an incapacitated individual, and so it lacked subject-matter jurisdiction to enter the stipulated order. He contended that the original lease was valid and binding.

After a three-day evidentiary hearing before a referee, the referee issued his findings of fact and determinations concerning the lease and the administration of the trust. The referee first determined that the February 9, 2021 order was valid and binding, reasoning that the probate court had the authority to enter the order after the parties agreed that it was in Ronald's best interests. In so doing, the referee rejected Bryan's contention that it violated the statute of frauds.

The referee next addressed the claims that John breached his fiduciary duties as trustee of the Layton Trust in such a way as to warrant removal. The referee opined that Bryan identified conduct that could serve as a valid basis for removal, but it found that the identified acts did not amount to a serious breach of trust. Notwithstanding that finding, the referee noted that the case involved high conflict and questioned whether John would be able to serve as trustee under the circumstances. For that reason, the referee recommended appointing a professional trustee.

In December 2021, the probate court rejected objections to the referee's findings and determinations, and accepted the appointment of Charlene Distler as the trustee for the Layton Trust. In January 2022, Bryan appealed by right the probate court's order of December 21, 2021, in each of the lower court cases.

## II. JURISDICTIONAL CHALLENGE

### A. STANDARD OF REVIEW

In his first two claims of error, Bryan argues that the probate court did not have jurisdiction to void the lease at issue and, for that reason, could not enter the stipulated order settling the dispute over the lease. We disagree. This Court reviews de novo the proper interpretation and application of the statutes governing the probate court's jurisdiction. See *In re Geror*, 286 Mich App 132, 133; 779 NW2d 316 (2009).

B. ANALYSIS

Probate courts are courts of limited jurisdiction. *Id.* Pursuant to MCL 600.841(1)(a), probate courts have jurisdiction as conferred under the Estate and Protected Individuals Code (EPIC), see MCL 700.1101 *et seq.* EPIC states that probate courts have exclusive jurisdiction over a proceeding that "concerns a guardianship, conservatorship, or protective proceeding." MCL 700.1302(c).

A person invokes a probate court's jurisdiction over a proceeding that concerns a conservatorship or protective proceeding by filing a petition for the appointment of a conservator or to make another protective order. See MCL 700.5401(1). Thereafter, the probate court may take action on the petition if the court finds, in relevant part, that the individual "is unable to manage property and business affairs effectively for reasons such as . . . physical illness," MCL 700.5401(3)(a), and finds that the "individual has property that will be wasted or dissipated unless proper management is provided . . .", MCL 700.5401(3)(b). If the probate court makes the required findings, it may "appoint a conservator or make another protective order." MCL 700.5401(1). See also *In re Bittner Conservatorship*, 312 Mich App 227, 237; 879 NW2d 269 (2015).

On appeal, Bryan argues that the probate court lacked subject-matter jurisdiction over this action, such that it could not consider a challenge to the lease, because it never adjudicated Ronald to be a protected person by making the findings required under MCL 700.5401(3). This argument confuses the erroneous exercise of discretion with a complete want of jurisdiction to hear a particular class of cases.

Subject-matter jurisdiction refers to the types of cases and claims that a court has the authority to address. See *Usitalo v Landon*, 299 Mich App 222, 228; 829 NW2d 359 (2012). Subject-matter jurisdiction does not depend on the correctness of a trial court's ultimate legal conclusions, meaning that an error in the exercise of jurisdiction must be distinguished from a want of jurisdiction. *Id.* Once jurisdiction has attached, errors or irregularities in the proceedings do not render the judgment void—they cause it to be erroneous and subject to being set aside on appeal. *Id.* at 228-229.

Bryan petitioned the probate court to appoint a conservator for Ronald, asking the court to either appoint a conservator or enter a protective order. In that petition, he alleged facts that, if proved by clear and convincing evidence, would warrant the probate court in exercising its discretion to take action. Bryan's petition was facially valid and invoked the probate court's exclusive jurisdiction to consider whether it was necessary to appoint a conservator or enter a protective order to protect Ronald's estate. See MCL 700.5401(1); MCL 700.5402(a) (stating that, once a petition for the appointment of a conservator or for a protective order has been filed, the probate court has jurisdiction to determine the need for a conservator or other protective order until the proceeding is terminated). See also MCL 700.1302(c). Accordingly, the probate court had subject-matter jurisdiction to consider the merits of Bryan's petition. Any error in the probate court's decision to enter a protective order would be an error in the exercise of jurisdiction and would not demonstrate that it lacked jurisdiction altogether. See *Usitalo*, 299 Mich App at 228-229. Moreover, Bryan has not established that the probate court erred when it entered a protective order.

The probate court appointed Rajani to serve as Ronald's lawyer, and she investigated the circumstances surrounding Bryan's request for a guardian and conservator. Although Rajani did not believe it was necessary to appoint a conservator for Ronald under the circumstances, she stated that Ronald was "unable to manage [his] property and business on his own as a result of physical illness and disability." Rajani also stated that the difficulties involving the administration of Ronald's estate involved the disagreements between John and Keith on the one side, and Bryan on the other. She opined that the disagreements could be mediated and, in that way, Ronald's estate could be protected. From this, it is clear that Ronald's own lawyer conceded that there were facts that would justify the probate court in taking action under MCL 700.5401(3). Rajani's statements to the probate court were also supported by Horton's similar report.

The probate court held a hearing on the request for a guardian and a conservator for Ronald. At the hearing, the parties each claimed that the other was taking actions to waste Ronald's assets. The probate court expressed concern about its jurisdiction, if the petition for a conservator were withdrawn, and it asked Ronald's lawyer, Rajani, to speak with her client about the need for a protective order. The court then recessed for a time to allow that. The court opined that that might avoid the need for witnesses to testify. After the break, Rajani stated that all the parties had come to an agreement that it would be appropriate to enter a protective order. She then related the terms of the proposed protective order to protect Ronald's estate and settle the dispute. Each of the parties then agreed with the decision to enter the protective order on the record.

Ronald, John, and Keith then entered into a stipulated agreement whereby Bryan withdrew his petition for the appointment of a conservator in lieu of a stipulated order protecting Ronald's estate. The stipulated order included provisions protecting Ronald's bank accounts and other assets. It also provided restrictions on the Layton Trust and Ronald's ability to take actions as the trustee of the Layton Trust. The probate court accepted the terms and conditions of the stipulated order and entered an order putting it into effect on May 13, 2019.

Notably, the probate court did not have to find that Ronald was an incapacitated individual within the meaning of MCL 700.1105(a), only that Ronald had, in relevant part, a physical disability that interfered with his ability to effectively manage his financial affairs, and that he had assets that might be wasted. Compare MCL 700.5306(1) with MCL 700.5401(3). By affirmatively agreeing to the proposed settlement of the dispute raised in the petition for the appointment of a conservator, Ronald—who everyone then agreed was mentally capable of communicating informed decisions—waived his right to have the facts supporting the probate court's authority to enter such an order established at an evidentiary hearing. See, e.g., *In re Potter*, 305 Mich 536, 540-541; 9 NW2d 833 (1943) (recognizing that a mentally competent person can waive his or her right to a hearing to prove the allegations in support of a petition). Ronald conceded the existence of facts bringing him within the provisions of MCL 700.5401(3). He further agreed to entry of the stipulated order of May 2019.[3] By accepting the stipulated order, the

---

[3] There was some confusion at the first hearing as to whether Margaret L. Webb appeared on Bryan's behalf or Ronald's behalf. The probate court, however, determined that Webb was representing Bryan. Webb later stated that Ronald agreed with the plan to settle the dispute. Bryan, however, worried that the protective order would not keep "them from doing the same

probate court adjudicated Ronald to be a protected individual for purposes of taking action under those sections of EPIC involving conservatorships and protective orders. See MCL 700.1106(x) (defining a protected individual to be a "minor or other individual for whom a conservator has been appointed or other protective order has been made as provided" under MCL 700.5401 *et seq.*). Accordingly, the probate court did not have to make specific findings as to each element because Ronald waived that requirement when he settled the dispute by agreeing to the protective order. See *In re Potter*, 305 Mich at 540-541.

Once the probate court adjudicated Ronald to be a protected individual, it had exclusive jurisdiction to determine how Ronald's estate would be managed until the court closed the proceeding. See MCL 700.5402(a) and (b); MCL 700.1302(c). These statutes gave the probate court continuing jurisdiction to enter protective orders directing the proper management of Ronald's estate and protecting his estate from misappropriation and mismanagement. See *In re Vansach Estate*, 324 Mich App 371, 388-389; 922 NW2d 136 (2018). Indeed, while Ronald remained a protected individual, the probate court had all the power that Ronald had to manage his estate. See MCL 700.5407(2)(c). See also MCL 700.5408(1) (listing the trial court's power to make protective arrangements for the protected individual).

The parties proceeded under the protective order without major disputes until Bryan asserted that Ronald had leased property, which was titled in the Layton Trust, to him for 10 years under circumstances that called into question the validity of the lease. John moved to invalidate the lease, in part, because he believed that Ronald could not enter into a lease of the Layton Trust's property.

The lease plainly impaired the value of Ronald's estate. It in effect removed a significant portion of Ronald's then-existing estate from Ronald's direct control—and the control of the probate court—by subjecting the property to the terms of the lease. Those terms included allowing Bryan to occupy the land for a decade without paying rent. It is questionable whether the lease provided Ronald's estate with consideration consistent with the going rental value for farm lands in the community. The lease was undated, and so its term was also unclear.

The conditions surrounding the execution of the lease were also suspect. Bryan asserted that his lawyer, Jeremy Baier, drafted the lease. That assertion brought into question whether the lease was executed after the probate court entered its protective order because the record suggests that Baier only became Bryan's lawyer after the entry of the protective order. If so, the lease may have violated the protective order, and may have been ultra vires. Additionally, there were medical records that suggested that Ronald was suffering from mental health issues and so might have been vulnerable to coercion or manipulation. The record also demonstrated that Ronald made a filing in the probate court that favored Bryan at about the same time and then later withdrew the filing

thing" with Ronald's property. As such, he stated, he did not agree with the settlement. Nevertheless, Bryan was the person who asserted that the probate court had the authority to act under MCL 700.5401(3) when he petitioned the court. His objection, therefore, cannot be understood as an assertion that the underlying facts were such that the probate court could not enter a protective order. He also personally signed the stipulated protective order.

on the ground that it did not represent his true wishes, which further suggested that there were concerns that Ronald was taking actions that were not in his best interests at the behest of others.

Under the circumstances, the terms of the lease implicated the probate court's authority to protect Ronald and his estate from the potential for misappropriation or mismanagement. See MCL 700.5407(2)(c); *In re Vansach Estate*, 324 Mich App at 388-389. It also implicated the probate court's jurisdiction to hear and decide a contract proceeding involving Ronald's estate. See MCL 700.1303(1)(i). Accordingly, the probate court had the exclusive jurisdiction to consider whether the lease was valid and enforceable against the Layton Trust because the lease concerned Ronald's estate, which then included rights under the Layton Trust. See MCL 700.5402(b). See also MCL 700.1104(b) (defining estate to mean the property of a person whose affairs are subject to EPIC).

Notwithstanding the statutes that provide the probate court with exclusive jurisdiction, Bryan asserts that the probate court did not have jurisdiction because the Legislature provided that other courts had exclusive jurisdiction to consider such matters. Specifically, he claims that the Legislature stated that the circuit court had exclusive jurisdiction to determine interests in property, citing MCL 600.3301, and to consider claims for waste to land, citing MCL 600.2919(3)(a). He also claims that district courts have sole jurisdiction to hear claims involving summary proceedings to recover possession of property, citing MCL 600.8302. Bryan's citations to do not establish that the probate court lacked jurisdiction to consider the validity of the lease.

In MCL 600.3301, the Legislature stated that an action for partition of lands "may" be brought in circuit court. Under MCL 600.2919(3)(a), the Legislature provided that circuit courts must grant injunctions under certain circumstances. And, under MCL 600.8302, the Legislature gave district courts concurrent jurisdiction with circuit courts involving certain equitable matters. None of the cited statutory provisions provide that probate courts lack jurisdiction to consider the validity of a lease that may have been entered in violation of the probate court's protective order. By contrast, EPIC unequivocally provides that the probate court has exclusive jurisdiction. See MCL 700.5402(b); *In re Vansach Estate*, 324 Mich App at 388-389.

Bryan's reliance on the decision in *Schaaf v Forbes*, ___ Mich App ___; ___ NW2d ___ (2021) (Docket No. 343630), is similarly misplaced. In that case, this Court held that a party could bring claims involving real property owned by a trust in circuit court, even though the Legislature gave exclusive jurisdiction over certain trust matters to the probate court. This Court did not hold that claims implicating real property could not be decided in probate court. See *id*. at ___; slip op at 3-5.

In sum, the probate court had jurisdiction over Ronald as a protected individual and had jurisdiction to consider the validity of the agreement in which Ronald purportedly leased the Layton Trust's lands to Bryan because that lease directly implicated the proper management of Ronald's estate.

## III. STATUTE OF FRAUDS

### A. STANDARD OF REVIEW

Bryan also claims that the probate court could not enter the order modifying the lease because he did not sign the stipulated order, and, as such, the order did not comply with the statute of frauds. We disagree. This Court reviews de novo whether the probate court properly applied the statute of frauds. *Kloian v Domino's Pizza*, LLC, 273 Mich App 449, 458; 733 NW2d 766 (2006).

### B. ANALYSIS

As already discussed, there were serious concerns about the validity of the lease that Bryan presented in the probate court. On the basis of those concerns, John moved to invalidate the lease. Rather than litigate the matter, the parties came to an agreement settling the dispute. John agreed to ratify the lease, but only so long as Bryan agreed to certain changes to the terms of the lease. Most importantly, the lease was to be changed to terminate on Ronald's death. All the parties agreed to the settlement of the dispute over the validity of the lease on the record in open court. After the parties agreed to the settlement and John's lawyer submitted a proposed order ratifying it, but before the probate court entered the order, Ronald died. Bryan now challenges the probate court's authority to ratify the agreement on the ground that Bryan never signed the order submitted under the seven-day rule.

The lease at issue—as amended—was for a term longer than one year. As such, it was void unless the "contract, or some note or memorandum thereof be in writing, and signed by the party by whom the lease or sale is to be made" or his or her lawfully authorized agent. MCL 566.108. Bryan asserts that both parties to the agreement must sign it. However, the statute does not require the lessee to sign it in order to comply with the statute of frauds. Rather, a writing meets the statute if it is signed by the lessor or otherwise authenticated by the lessor. See *Jim-Bob, Inc v Mehling*, 178 Mich App 71, 87; 443 NW2d 451 (1989).

John was the trustee at the time of the parties' agreement to amend the lease, and the parties agreed that John's lawyer would submit the agreement to the probate court. John's lawyer submitted the stipulated order to the court and signed it before Ronald's death. That was sufficient to meet the requirements of MCL 566.108.

In any event, the agreement to settle the dispute about the validity of the lease was binding on the parties. See MCR 2.507(G); MCR 5.001(A). After agreeing to the settlement in open court, Bryan could not disavow the agreement or refuse to sign the stipulated order—if the probate court had ordered it—absent evidence of mistake, fraud, or unconscionable advantage that would justify setting aside the agreement. See *Mich Bell Telephone Co v Sfat*, 177 Mich App 506, 515; 442 NW2d 720 (1989). The purpose of a statute of frauds is to prevent fraud or the opportunity for fraud; it is not "to be used in the aid of fraud or prevention of justice." *Kloian*, 273 Mich App at 456-457 (quotation marks and citation omitted). Bryan induced John to settle the dispute over the validity of the original lease by agreeing to modify the terms of the lease. He agreed to that settlement in open court, which made his agreement binding under MCR 2.507(G), even if he did not sign it. See, e.g., *Vittiglio v Vittiglio*, 297 Mich App 391, 397-399; 824 NW2d 591 (2012)

-11-

(rejecting the argument that MCL 566.106, MCL 566.108, or MCL 566.132 barred a settlement agreement because the agreement was made on the record in open court which satisfied the statute of frauds).

Bryan has not shown that the settlement agreement was barred by the statute of frauds.

## IV. REMOVAL OF TRUSTEE

For his last claim of error, Bryan argues that the probate court should have specifically found that John violated his duties as trustee. He does not, however, explain why that matters. In his motion, Bryan asked the probate court to remove John as trustee on the grounds that John had been mismanaging the Layton Trust, and further asked the court to appoint Charlene Distler as his successor. Although the referee did not cite mismanagement as the ground for relief, it granted Bryan all the relief that he requested in his motion: it removed John as trustee and appointed Distler to be his replacement. Accordingly, Bryan received all the relief that he requested, and there is no further relief that this Court can grant him, making the issue—at least as framed by Bryan on appeal—moot. See *Gleason v Kincaid*, 323 Mich App 308, 314-315; 917 NW2d 685 (2018).

## V. CONCLUSION

Bryan has not identified an error in any of the lower court cases that warrant relief. Accordingly, we affirm in each docket.

Affirmed. As the prevailing parties, John, Keith, and the Layton Trust may tax their costs. See MCR 7.219(A).

/s/ Michelle M. Rick
/s/ Mark T. Boonstra
/s/ Colleen A. O'Brien